Harry GRANADER, in his individual capacities of his separate businesses and as a stockholder and director of Public Bank, and as a member of the following classes: the classes being the stockholders of Public Bank, a Michigan Banking Corporation, and the Directors of the Public Bank, a Michigan banking corporation, Plaintiff,

Irwin J. Kasoff and Rose Kasoff, Individually and on behalf of the Public Bank Shareholders Protective Association and for other stockholders similarly situated as a class, Plaintiffs-Intervenors,

v.

PUBLIC BANK, a Michigan banking corporation, et al., Defendants.

Civ. No. 29240.

United States District Court
E. D. Michigan, S. D.

Nov. 17, 1967.

William I. Liberson, Peter P. Gilbert, Detroit, Mich., for plaintiff.

Harry H. Young, Detroit, Mich., for Kasoffs, plaintiffs-intervenors.

Frank J. Kelley, Atty. Gen. of Mich., Lansing, Mich., Harry M. Nayer, Detroit, Mich., for financial institutions of Michigan (defendant).

George E. Parker, III, Detroit, Mich., for Federal Deposit Insurance Corp.

Edward B. Harrison, Detroit, Mich., for Touche, Ross, Bailey & Smart, defendants.

Avern Cohn, Detroit, Mich., for Federal Deposit Ins. Corp., defendant.

William H. Merrill, Detroit, Mich., for Bank of the Commonwealth, defendant.

OPINION ON DEFENDANTS' MOTION FOR A SUMMARY JUDGMENT AND/OR MOTION TO DISMISS

KAESS, District Judge.

This is an action arising out of the sale of all the assets of Public Bank, a Michigan banking corporation, to the Bank of the Commonwealth, another Michigan banking corporation, on October 12, 1966. The sale took place after Wayne County Circuit Judge Benjamin D. Burdick declared the Public Bank to be insolvent and appointed Federal Deposit Insurance Corporation as the Receiver of said bank on October 11, 1966. A subsequent hearing on the validity of the receivership proceeding and the adequacy of the sale of the assets had been scheduled before Wayne County Circuit Judge Blair Moody, Jr., for April, 1967. On September 29, 1967, Judge Moody in an exhaustive opinion, which findings are incorporated in this opinion, as all interests were properly represented, determined that, among other things, Public Bank was on the brink of collapse, that the receivership proceeding was valid and that the sale of the assets was adequate and proper and, in fact, had the sale not taken place, the public would have suffered greatly. Thus, we have before the court a *unique* situation, in that a court of competent jurisdiction (the Wayne County Circuit Court) had conducted extensive hearings regarding this particular sale, in order to determine if the appointment of a receiver was necessary in light of the surrounding circumstances. This court will not reiterate those findings, but will attach the opinion of Judge Moody as an appendix to this opinion.

The plaintiffs are maintaining this action under Title 15, U.S.C. § 15 and § 26, alleging in their complaint violations of the Federal Anti-trust Laws, more specifically Sections 1 and 2 of the Sherman Act and Section 7 of the Clayton Act, and a violation of the Fourteenth Amendment to the United States Constitution and are seeking treble damages and a restraining order prohibiting the transfer of assets of Public Bank. The defendants move to dismiss the complaint or, in the alternative, the granting of summary judgment in their favor.

In construing a complaint in a private anti-trust action, this court adopts those principles enunciated by the United States Supreme Court in Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); Radiant Burners, Inc. v. Peoples Gas Light & Coke Co., 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1960), that to state a claim upon which relief may be granted, allegations merely have to be sufficient to show a violation. It is the position of this court to read the complaint in the light most favorable to the plaintiffs.

Thus, the issue for this court to decide is whether the plaintiffs' complaint states a claim upon which relief could be granted.

In resolving the motion, this court will determine if all the facts constitute a violation of the 14th Amendment, §§ 1 and 2 of the Sherman Act, or § 7 of the Clayton Act.

Section 7 of the Clayton Act provides:

"Sec. 7. That no corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

"No corporation shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of one or more corporations engaged in commerce, where in any line of commerce in any section of the country, the effect of such acquisition, of such stocks or assets, or of the use of such stock by the voting or granting of proxies or otherwise, may be substantially to lessen competition, or to tend to create a monopoly.

"This section shall not apply to corporations purchasing such stock solely for investment and not using the same by voting or otherwise to bring about, or in attempting to bring about, the substantial lessening of competition. Nor shall anything contained in this section prevent a corporation engaged in commerce from causing the formation of subsidiary corporations for the actual carrying on of their immediate lawful business, or the natural and legitimate branches or extensions thereof, or from owning and holding all or a part of the stock of such subsidiary corporations, when the effect of such formation is not to substantially lessen competition. * * * "

■ The purpose of § 7 was to arrest incipient threats to competition which the Sherman Act did not reach. United States v. E. I. Du Pont De Nemours & Co., 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed. 2d 1057 (1957); United States v. Penn-Olin Chemical Co., 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964); United States v. Continental Can Co., 378 U.S. 441, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964). Section 7 is extended to cover three types of mergers: Vertical, Conglomerate, and Horizontal,[1] and is applicable to bank mergers.[2] And under Section 7, both the acquirer and acquired must be engaged in commerce. The section is broadened to cover both the acquisition of a corporation's stock, as well as its assets. In fact, there is no need for actual anticompetitive effects— merely a reasonable probability of a substantial lessening of competition or a tendency toward monopoly, and this is often referred to as the incipiency doctrine.[3] The clear object of § 7 being to nip monopolistic tendencies in their incipiency.

There are certain exclusions from a Section 7 violation, such as where purchases are solely for investment [4] and the formation of a subsidiary corporation.

There also exist certain defenses to Section 7, and one such defense is urged upon this court—the "failing company" defense. The court sustained the defense

1. Turner, "Conglomerate Mergers and Section 7 of the Clayton Act." 78 Harvard Law Rev. 1313; United States v. E. I. Du Pont De Nemours & Co., supra; Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1961).

2. United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); Carter, "Bank Mergers: New Law & Renewed Litigation" 12 AntiTrust Bulletin 109.

3. Brown Shoe Co. v. United States, supra; United States v. Penn-Olin Chemical Co., supra; Senate Report No. 1775, June 2, 1950, U.S.Code Congr.Serv. 4296, 4297.

4. United States v. E. I. Du Pont De Nemours & Co., supra.

of a failing company in International Shoe Co. v. Federal Trade Commission, 280 U.S. 291, 50 S.Ct. 89, 74 L.Ed. 431 (1929), although this was under the old Section 7 prior to amendment. After amendment Congress did not expect that Section 7 would prevent a company in a failing or bankrupt condition from selling out.[5] And it was not the intention of Congress to preclude a merger between a corporation which was financially healthy and a failing corporation which no longer could be a vital factor in the market.[6] There are two views on whether it's an absolute defense to § 7 violation to merely show a company in bankruptcy. Some say if the acquirer is the only one in a position to a company, the defense is adequate; others hold the defense would not be proper until it is determined who else would or could purchase the business.

▬▬▬ This court has before it a *unique* situation, in that it has the benefit of the findings of Judge Moody. Judge Moody conducted a most extensive hearing to determine whether the receivership appointment, sale of the assets, and transfer, was done in accordance with the governing laws and did not violate anyone's rights, and, in effect, determined this precise issue, whether Public Bank was a failing company and whether the acquirer provided the best offer to the receiver. The hearing was open to all parties concerned and every interest was represented. To now, at this time, make a new fact determination as to whether the Public Bank was on the brink of bankruptcy and the sale to the Bank of the Commonwealth was done in order to protect the interests of the general public would, in effect, be attacking the work of Judge Moody. The plaintiffs are asking this court to disregard the judgment and opinion of a court of competent jurisdiction. The plaintiffs have not set forth any new justiciable issue which was not determined in the Circuit Court. They have presented to this court the same issue

already determined in the Circuit Court, whether Public Bank was in such financial condition as to require the appointment of a receiver. And it was determined that Public Bank was on the brink of bankruptcy with no possibility of recovery, and in order to protect the public interest, the receiver should be appointed and a sale commenced. The sale of the assets occurred only after all offers were duly considered and the Bank of the Commonwealth provided the best offer. This court will accept the judgment of the Circuit Court and the plaintiffs may not use this court to attack the findings of the Circuit Court. Southern Md. Agr. Ass'n of Prince George's County v. United States, 147 F.Supp. 276, 137 Ct.Cl. 176 (1957). The plaintiff is, in effect, estopped to collaterally attack the findings of Judge Moody. Partmar Corp. et al. v. Paramount Pictures Theatres Corp., et al., 347 U.S. 89, 74 S.Ct. 414, 98 L.Ed. 532 (1954); Higginson v. Schoeneman, 89 U.S.App.D.C. 126, 190 F.2d 32 (4 Cir., 1951); Fuller v. Vanwagoner, D.C., 49 F.Supp 281 (1942); Perkins v. Southern Coal Corp., D.C., 96 F.Supp. 8, aff'd 190 F.2d 692 (1951); United States v. Kusche, 56 F. Supp. 201 (1944). The defense of failing company urged by the defendants meets the tests set forth by the Supreme Court; Public Bank was on the brink of bankruptcy with no chance of rehabilitation. Bank of the Commonwealth provided the best offer in light of the circumstances. Therefore, the acquisition of Public Bank's assets did not violate § 7 in lieu "failing company" defense. There being no facts in dispute, this court hereby grants summary judgment in favor of the defendants with regard to § 7 violation.

▬▬▬ The plaintiffs also allege a violation of § 2 of the Sherman Act, which states:

"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or per-

---

5. Senate Report No. 1775, June 2, 1950 U.S.Code Congr.Serv., p. 4299.

6. Brown Shoe Co. v. United States, supra.

sons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

Given all of the facts, as set forth in the complaint, is this sufficient to justify a violation of § 2? The complaint is defective in that there is no showing in the complaint that the defendants possess monopoly power or any likelihood they could acquire it. This is an essential element to a § 2 violation, that the defendants have monopoly power. American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1945).[7] Monopoly power means the same thing in law or economics. It is the power to fix prices (market prices) or the power to exclude competitors. Power to control the market. Monopoly power differs from market power. Monopoly power means the power to control the market. Market power may be sufficient or insufficient to be monopoly power. In United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416 (1945), it was held that 90% of the market constituted monopoly power.[8] Section 2 makes it a violation to exclude competition, provided the power is coupled with purpose or intent to exercise that power. United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948). Thus, there needs to be showing of wrongful intent.[9] The complaint fails to disclose any wrongful intent on the part of the defendants. Therefore, by the failure to allege any existence of a monopoly power or any likelihood that the defendants would acquire it, or that the defendants have a wrongful intent, the complaint must be dismissed as to a violation of § 2 of the Sherman Act.

■ Section 1 of the Sherman Act provides:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal:" 15 USC § 1

The complaint alleges a conspiracy and the court has before it only the allegation of conspiracy. There is no allegation of what was done in "restraint of trade". The conspiracy must be a conspiracy to do some act in restraint of trade. If it is not in "restraint of trade" there can be no violation. The act in restraint of trade may be a violation per se such as price fixing[10] or allocation of markets[11] or an unreasonable act, such as

7. United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966), held that the offense of monopoly under § 2 of the Sherman Act (15 U.S.C. § 2) which makes it an offense to monopolize any part of the trade or commerce among the several states, has two elements: (1) the possession of monopoly power in the relevant market, and (2) the wilful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.

8. See Chief Judge Knox District Court exhaustive opinion of the same case reported in D.C., 91 F.Supp. 333.

9. Union Leader Corp. v. Newspapers of New England, Inc., 1 Cir., 284 F.2d 582 (1960); Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); United States v. United Shoe Machinery Corp., D.C., 110 F.Supp. 295 (1953).

10. United States v. General Motors Corp., 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1965); Sun Oil Co. v. FTC, 7 Cir., 350 F.2d 624, cert. denied, 382 U.S. 982, 86 S.Ct. 559, 15 L.Ed.2d 473 (1965); United States v. Paramount Pictures, Inc., 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948); United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024 (1943).

11. Ford Motor Co. v. Webster's Auto Sales, Inc., 1 Cir., 361 F.2d 874 (1966); Timken Roller Bearing Co. v. United States, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951).

group boycotts or refusals to deal [12] by incorporating the Rule of Reason approach.[13] There is presented no violation in restraint of trade, either per se or under the Rule of Reason, as all that is alleged is that the defendants merely conspired. The failure to state what violative act the defendants conspired to do is fatally defective and the complaint should be dismissed.

It is noted by this court that defendants did not commit any violation per se by any stretch of the imagination and if any violation did occur, it would have to be an unreasonable act in restraint of trade. No acts performed by the defendants were unreasonable. In fact, they acted in a most reasonable manner under the circumstances as disclosed in Judge Moody's opinion. Therefore, following Justice Brandeis' [14] Rule of Reason approach, it is clear that the acts of the defendants were reasonable. Since the acts of the defendants were not such as to constitute a violation per se nor were they such as to be unreasonable, the claim under § 1 of the Sherman Act must be dismissed for failure to state a cause of action.

█ With regard to the alleged violation of the 14th Amendment, the taking of property without compensation, it is sufficient to state that the question is now moot in light of Judge Moody's opinion and in view of the defects of this complaint, in that there was no violation of anti-trust laws and no unlawful taking.

Therefore, it is this court's opinion that summary judgment is granted to defendants on § 7 violation of the Clayton Act, based upon the defense of the failing company doctrine, the complaint is dismissed on § 2 violation of the Sherman Act as the plaintiffs fail to allege defendants have monopoly power, and it is dismissed on § 1 violation of the Sherman Act as plaintiffs fail to allege what violative act was done in restraint of trade. The question of deprivation of property without due process is moot in light of Judge Moody's opinion that the plaintiffs will be compensated for the assets.

This court is in accord with the general proposition that a complaint in a private anti-trust action should be construed most favorably for the plaintiffs, as previously stated, and this court has sought to act accordingly. However, it was presented with a unique situation in that it had the aid of the well-written opinion of Judge Blair Moody, Jr. Thus, presented with the complaint and given no facts in dispute, this court has but one course to follow, to dismiss the action for the above stated reasons. It is to be noted that the other defenses raised by the defendants, e. g. immunity, lack of standing, etc., need not be considered as the issue is now moot.

An order in accordance with this opinion may be submitted by the parties.

## APPENDIX

### STATE OF MICHIGAN

### IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

IN THE MATTER OF THE PETITION OF CHARLES D. SLAY, COMMISSIONER OF BANKING OF THE STATE OF MICHIGAN, FOR THE APPOINTMENT OF A RECEIVER FOR THE PUBLIC BANK OF DETROIT, MICHIGAN.     No. 74962

---

12. Klor's Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed. 2d 741 (1959) ; Fashion Originators' Guild of America v. F T C, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941).

13. Board of Trade of the City of Chicago v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918).

14. Board of Trade of the City of Chicago v. United States, supra.

## OPINION

This case was commenced at 5:30 p. m., October 11, 1966, when Charles D. Slay, Commissioner of Banking of the State of Michigan, filed a petition for the appointment of a receiver for the Public Bank, Detroit, Michigan. The Court granted the petition and appointed the Federal Deposit Insurance Corporation ("FDIC") receiver without bond pursuant to Sections 115 and 125 of the Michigan Financial Institutions Act, Comp.Laws Mich. 1948, §§ 487.115, 487.125. Such order was approved and dated during the early hours of October 12, 1966. Immediately upon its appointment the receiver filed a petition for approval of a proposed sale by the receiver of assets and assumption of liabilities of Public Bank ("Public") to the Bank of the Commonwealth ("Commonwealth"). Such petition also was approved by the Court and an order authorizing the sale was entered during the early hours of October 12, 1966.

Among other items the last mentioned order specified:

"IT IS FURTHER ORDERED that any party in interest who considers himself aggrieved by this order, shall appear before this court at 9:30 a. m. on the 2nd day of November, 1966 and show cause why this order should be set aside."

The order further provided that a copy of such order and the receiver sale agreement be mailed to all shareholders of Public Bank of record at least 10 days prior to the stated hearing date.

On November 2nd Judge Benjamin Burdick of the Wayne County Circuit Court to whom this case was originally assigned, conducted a preliminary hearing with the purpose of developing a plan of procedure regarding the above defeasance provision in the sale order of October 12th.

At this hearing Judge Burdick made a statement on the record reflecting his relationship to the parties and counsel in this case. The statement of Judge Burdick called attention to the fact that his son-in-law David Page was a member of the law firm of Honigman, Miller, Schwartz & Cohn, co-counsel for the receiver, although reflecting that Mr. Page would in no way participate in this matter. He also revealed that he was personally indebted to Commonwealth on several loans and had several fiduciary accounts in Commonwealth as well as in other banks. He stated his personal banking business was conducted with City National Bank. He reflected that "none of the foregoing would in anyway affect my ability to hear and adjudge all matters in this case fairly and impartially." The case was then adjourned for two weeks until November 17, 1966.

In the meantime numerous motions were filed by persons who considered themselves aggrieved by the action of the Court. One motion was filed on November 4th seeking to disqualify Judge Burdick. This motion was assigned to Judge Kaufman who set a hearing date of November 14, 1966. Judge Burdick on November 11, 1966 made a formal statement to the Presiding Judge, Thomas G. Murphy, requesting that the Presiding Judge reassign the subject case under Michigan Court Rule 925 to another judge.

On November 14, 1966 Judge Kaufman declined to rule on the motion to disqualify Judge Burdick and referred the matter to the Presiding Judge. Since Burdick had requested the matter be reassigned, Kaufman concluded there was nothing before him.

A formal letter was sent from Judge Burdick to Judge Murphy and a copy of his statement was filed November 15, 1966. Thereupon Judge Murphy "for the reasons set forth in Judge Burdick's statement", reassigned the subject cause by blind draw to this Judge by order dated November 15, 1966.

A motion was then filed before Murphy to set aside the reassignment on the ground that Burdick could not voluntarily withdraw. This motion was denied. Also a motion was filed before Judge Kaufman to rule one way or another on the

disqualification motion. The motion was also denied.

In the interim, this Court promptly presided over the adjourned hearing previously set for November 17, 1966, at which time specific ground rules for the proceeding were outlined. In order to provide opportunity to prepare for the show cause hearing and yet proceed as rapidly as possible, the show cause hearing was then scheduled to commence November 28, 1966. This Court then reflected as a part of the ground rules in view of the diversification of positions of numerous counsel, that any and all legal and factual objections to the prior orders of the Court raised by motion or at such show cause hearing, would be considered and ruled upon, if appropriate, at the termination of such hearing.

However, on November 25th an interested party filed a petition with requisite supporting documents and pleadings which caused the removal of the entire receivership proceeding to the United States District Court of the Eastern District of Michigan. Accordingly, this Court, being so notified upon commencement of the November 28th hearing, promptly adjourned such hearing without date pending proceedings in the District Court. Thereafter on December 7, 1966, the Federal District Court remanded this cause back to the State Court from which it originated on the ground of improvident removal.

At that point two applications for leave to appeal were being submitted to the Court of Appeals. One appeal related to the disqualification of Judge Burdick. The second tested the reassignment order of Judge Murphy. These applications were denied by the Court of Appeals on February 21, 1967 and were later denied by the Supreme Court, permitting this Court to proceed with the show cause hearing. On March 1, 1967, this Court gave notice to all parties of record that the show cause hearing would commence April 6, 1967 and run continuously until all testimony, evidence and argument would be submitted for determination.

The hearing commenced April 6th and final arguments were completed August 31, 1967.

## ISSUES

A multitude of issues were raised at the show cause hearing. A listing of these major points of contention will be followed in order by associated findings of fact and then legal and factual conclusions. These basic issues were raised by parties who considered themselves aggrieved by the actions of the Court on October 11th and October 12th, 1966 as follows:

1. Whether the proceedings which caused the designation of Judge Burdick to hear the petition of the State Banking Commissioner prior to the commencement of the action were violative of General Court Rule 925.5(1) causing sufficient error to set aside all orders of October 12, 1966;

2. Whether the proceedings before Judge Burdick relating to the hours that the court was in session were violative of the Wayne County Circuit Court Rule 1.2 causing sufficient error to set aside all orders of October 12, 1966;

3. Whether the hearing before Judge Burdick was a public hearing as required under M.S.A. 27A.1420, Comp.Laws Mich.1948, §§ 600, 1420 [Pub.Acts 1961, No. 236];

4. Whether this Court should consider all testimony including the full record submitted at the April 6th hearing or be limited to the record made on October 11th and 12th before Judge Burdick plus only procedural testimony in evidence introduced at the April 6th hearing;

5. Whether the proceedings before Judge Burdick were contrary to the 14th and 5th Amendments of the Constitution of the United States as well as the Constitution of the State of Michigan as violative of due process since the Court

appointed a receiver and then approved the sale of the property of shareholders allegedly without notice to Public Bank, its officers, directors or shareholders and without the opportunity for a fair and full hearing;

6. Whether at the time of the appointment of a receiver on October 12, 1966, Public Bank was insolvent within the purvue of Section 115 of the Michigan Financial Institutions Act;

7. Whether, at the time of the appointment of a receiver on October 12, 1966, such appointment was expedient under the Michigan Financial Institutions Act;

8. Whether the appointment of the FDIC as receiver was authorized and appropriate under the Michigan Financial Institutions Act;

9. Whether the FDIC as receiver must be a "disinterested person" under the attending facts;

10. Whether the sale contract approved by the Court on October 12, 1966, was a "fair" agreement;

11. Whether this Court may and should independently ratify the findings and orders of October 11th and 12, 1966;

12. Whether Judge Burdick was disqualified from hearing and acting upon the petition of the Banking Commissioner;

13. Whether Judge Moody could conduct the hearing of April 6th without first having scheduled and presided over a pre-trial conference and having prepared a pre-trial statement;

14. Whether the reassignment of this cause from Judge Burdick to Judge Moody was permissible and proper under Michigan Court Rules.

## FACTS

In view of the complexities of this case combined with its great importance to all parties, not to mention depositors and the financial community, a listed finding of facts in detail is perceived by this Court to be its responsibility. Thus the following constitutes this Court's findings of fact following in sequence as close as possible the above mentioned issues:

1.) Approximately two or three weeks prior to October 11, 1966, the date of the filing of the instant petition by the Banking Commissioner, William R. Rudell, Assistant Attorney General of the State of Michigan as attorney for the petitioner, first disclosed to Judge Thomas G. Murphy, the Executive Judge of the Wayne Circuit Court, that "an important case" might break and possibly assistance would be needed after regular court hours. About one week or ten days before October 11, 1966, Mr. Rudell returned again and informed Judge Murphy of the specific nature of the proceedings and that Public Bank was involved. At this second meeting Judge Murphy consulted with Judge Sullivan, then Presiding Judge Pro Tem of the Wayne Circuit Court in the presence of Mr. Rudell. Thereupon the names of all judges of the Wayne County Circuit Court were placed on slips in a hat and the name of Judge Benjamin Burdick was drawn from the hat by Judge Sullivan. Thereupon Judge Burdick immediately was called to the chambers of Judge Murphy, and in the presence of Mr. Rudell, Judge Murphy and Judge Sullivan, was informed of his selection, the nature of the petition, and the banking institutions involved. Judge Burdick indicated upon inquiry that he would be in no way disqualified. He was advised if and when the petition was filed he would hear the matter and Mr. Rudell would contact him prior to such action being taken to effectuate time arrangements.

2.) That prior to the institution of the action, the selection of Judge Burdick was related by Mr. Rudell to other representatives of the Attorney General's office, the petitioner, a representative of the FDIC and an attorney of Commonwealth. No agent, representative or attorney of Public was informed of the

Judges' conference or of the selection of Judge Burdick.

3.) That approximately noon on October 11, 1966, Mr. Rudell as attorney for the Petitioner, conferred with Judge Burdick advising him that the petition of the State Banking Commissioner would be filed on that date and was advised by the Court that arrangements would be made to have the Court's personnel available for a hearing that evening.

4.) That the petition was filed at 5:30 p. m., October 11, 1966, which was handled by Mr. Ben Williams, Deputy Wayne County Clerk, by a pre-arrangement with the Wayne County Clerk and that at such time of filing, the Deputy Clerk was advised that the matter had been assigned to Judge Burdick.

5.) The State Banking Commissioner through his agents and attorneys promptly advised representatives of the Federal Deposit Insurance Corporation and representatives of the Bank of the Commonwealth, of the proposed filing time and that the matter would be heard by Judge Burdick that evening. Mr. Jason Honigman and Mr. Milton Miller, from a firm later to be appointed co-counsel for the receiver, were informed of the evening hearing. Neither Public Bank or any of its representatives or attorneys or agents were advised of the contemplated filing of the petition that evening or the fact that hearings were to be conducted thereon by Judge Burdick.

6.) That the hearing before Judge Burdick on October 11, 1966, commenced at 6:35 p. m. and continued until 7:40 p. m. After a recess the Court convened at 12:35 a. m. on October 12, 1966 and continued until the conclusion of the proceedings at 1:00 a. m. on the same date. The appearances in proceedings before Judge Burdick are completely reflected in the transcript of such proceedings, being Miro Exhibit A in evidence in this cause.

7.) Approximately 25 persons, including representatives from the Attorney General's office, the State Banking Department, the FDIC and Commonwealth, assembled in Judge Burdick's courtroom about 6:00 p. m. the evening of October 11, 1966. Most of these persons entered the City-County Building through the Larned Street door which was the only entrance open, together with the Jefferson entrance, after 5:30 p. m. Some of the persons in attendance headed directly to Judge Burdick's courtroom without being asked as to their intentions. Others were queried and were permitted to proceed upon advising the doorman of their intention to attend Judge Burdick's courtroom. Anyone desiring to go to Judge Burdick's courtroom was admitted to the building. Prior arrangements were made by telephone from Judge Burdick's office with the doorman to permit any person to enter the building to proceed to his courtroom. The door to Judge Burdick's courtroom was open during the entire hearing. All testimony was taken in the open courtroom by an official court reporter. All persons desiring to go to Judge Burdick's courtroom were permitted to proceed to the courtroom. The arrangements established that evening were in violation of the building supervisor's instructions which requires the guard to receive written instructions disclosing the names of persons to be admitted, designating the area that the persons were to proceed. Although a log was maintained by the guard which ostensibly required all persons entering and leaving the building to register, such registration was carried out in some but not in every instance on the evening of October 11th and 12th, 1966.

8.) The hearing before Judge Burdick commenced at 6:35 p. m. by the taking of the testimony from Murray Miller, a senior examiner of the State Banking Department, Paul F. O'Neill, a senior examiner of the FDIC and Commissioner Slay. The hearing recessed at 7:40 p. m. and commenced again at 12:35 a. m. on October 12, 1966. At that time the Court made a finding that the Public was insolvent and

"In order to protect the depositors, the creditors and others doing business

with this bank and to stop any possible interruption of business and a run on the bank or any other bank in the area, I do hereby appoint the Federal Deposit Insurance Corporation as Receiver, with all of the powers and privileges provided by the laws of the State of Michigan; and that title to all of the assets, business and property of said bank of every kind and nature· shall pass to and vest in the Federal Deposit Insurance Corporation, as Receiver, without execution of any instruments of conveyance, assignment, transfer or endorsement."

9.) Judge Burdick then entered an order appointing FDIC as receiver which appointment was immediately accepted. Next the Court appointed Miller, Canfield, Paddock & Stone, and, Honigman, Miller, Schwartz & Cohn as co-attorneys for the receiver and entered an order to such effect. Promptly thereafter counsel for the FDIC in its capacity as receiver petitioned both orally and in writing for approval by the Court of the sale of substantially all of the liabilities of Public (including all deposit liabilities) by Commonwealth pursuant to a receiver's sale agreement which was attached to the petition for approval of the sale being a part of so-called Agreement B, to be identified herein. The Court was advised that the sale to Commonwealth was the only sale then available; that if not approved forthwith under the sale agreement, Commonwealth could withdraw because of the resultant interruption of banking services that the directors of Public had previously approved a direct sale agreement substantially identical to the proposed receiver's sale agreement; that Public would lose its value as a going concern to prospective purchasers; and that the opportunities to collect claims would be more difficult in the hands of a receiver than in the case of a going concern. The Court then authorized a sale by formal order of approval which included the defeasance clause cited heretofore.

10.) That from the inception of the hearings commenced on October 11th and concluded on October 12, 1966, including the approval of orders by Judge Burdick appointing a receiver, appointing attorneys for the receiver and ordering the sale of the assets of Public to Commonwealth, all was conducted without the presence of or notice to Public or anyone of its agents, representatives or attorneys.

11.) Extreme precautions were taken by the Commissioner's agents and attorney to prevent premature publicity over the possibility of a receivership. To effectuate the provisions of the Receivership Sale Agreement, proceedings would have to be commenced after banking hours and completed overnight or over a weekend to avoid interruption of banking services.

12.) Public Bank is a State Bank chartered under the Michigan Financial Institutions Act. It is not a member of the Federal Reserve System but is an insured bank with the Federal Deposit Insurance Corporation. It is subject to examination by both the State Banking Department and the FDIC.

13.) As of October 11, 1966, there were 452,000 shares of $10 par common stock outstanding of Public Bank. As of the same date such stock was held by approximately 3,100 shareholders.

14.) It was determined by Federal and State authorities that a joint examination of Public Bank be conducted in the spring of 1966. Such examination is known as the examination as of March 28, 1966. The examination commenced on March 28th and continued until June 10, 1966. Such examination was under the joint direction of Murray Miller, Senior Michigan State Bank Examiner with 14 years experience, and of Paul O'Neill, FDIC Field Examiner with 33 years experience with the FDIC. An approximate total of 40 men conducted the examination, about half from each agency. Each agency exchanged men with the other attempting to use the best qualified men for each assignment.

15.) Prior to this examination, Michigan State Banking authorities considered

Public Bank a "problem bank". Commissioner Slay met with the Board of Public Bank from the time he became Commissioner in 1961 through October 11, 1966, more times than with all other Michigan Banks put together.

16.) Prior to this examination, as far back as the middle of 1963, the Accounting Department Manager of Public Bank took exception with his superiors to certain accounting methods employed by Public. He raised questions with respect to the handling of the unearned income account at the time and the fact that the bank then switched from the 78th's accounting system to a formula of maintaining approximately 12% or less of the total gross outstanding on installment loans in the unearned interest account. Furthermore, he objected to the transfer of approximately $500,000.00 from the unearned interest account to undivided profits account at one time. Again in March, 1965, the same accounting officer raised questions with respect to the handling of the unearned interest account, the renewal of consumer loans and the establishment of certain loss reserves pertaining to the originator of one of two major sources of installment home improvement contracts being purchased by the bank. These objections made to several directors and officers of Public Bank from evidence presented at this hearing, in reply he was advised that the methods used were in accordance with normal banking operation or that the matter would be looked into, but at that time no different action was taken. It was the opinion of this chief accounting officer of Public Bank in the early fall of 1965, that the "unearned interest account" was understated in Public Bank's records which would have the effect of overstating the bank's realized income.

17.) The handling of the unearned interest account by Public was brought to the attention of the State Banking Commissioner in September, 1965 by an officer of Public Bank. During the fall months of 1965 a Federal Grand Jury was in the process of investigating Public's method of accounting, in particular, relating to its unearned interest account. Meetings and discussions were had during the month of September and November between the Commissioner and directors and officers of Public Bank with respect to this matter.

18.) Shortly prior to November 3, 1965, the secretary of Public advised the directors of the Bank that an initial accounting run had been made reflecting a deficiency in the unearned income account of $1,509,000.00 which would reflect in an overstatement of earnings. Such initial run was disputed and required further detailed checking in the opinion of other officers of Public Bank. At the November 3rd meeting with the Board, the State Banking Commissioner requested that an audit of the unearned interest account be made to determine any deficiency. There were substantial differences of opinion as to the most prudent method for accounting to appropriately reflect whether there was any deficiency or not. Shortly after the meeting of November 3rd between the Commissioner and the Board of Public Bank, the President of Public Bank, Mr. Hay, resigned on November 10th, effective November 30, 1965.

19.) The Board of Directors of Public thereupon promptly made arrangements with the accounting firm of Touche, Ross, Baily & Smart ("Touche") to conduct an audit of the unearned interest account. Touche previously was retained to prepare an audit report and balance sheet as of November 29, 1965.

20.) The audit report prepared by Touche as of November 29, 1965, was was not accurate, according to Touche, as it did not state fairly the financial position of Public for several reasons, including the fact that the allowance for possible losses on loans was not adequate to provide for anticipated losses and the liquidation for such loans and the method of determining unearned income on installment loans did not spread income of such loans over their terms.

21.) Subsequently, with respect to the unearned interest investigation, a written opinion was issued by Touche on December 30, 1965, which reviewed the bank's computations of unearned interest under three possible types of "money in use methods". The methods were as follows:

"*Method No. 1* had the effect of absorbing income on the 78'ths method over a number of months equal to the number of payments stipulated by the original terms of the loan, and disclosed a deficiency in unearned discount and an overstatement of profits in the approximate amount of $1,835,000.00.

"*Method No. 2* would give effect to periods of nonpayment during the first months of certain home improvement loans, and disclosed a deficiency in unearned discount and an overstatement of profits in the approximate amount of $2,045,000.00.

"*Method No. 3* provided that amounts representing estimates of loan acquisition costs ($19.55 a loan) would be deducted from original net finance charges and recognized as earnings as loans are made, with the remainder being absorbed into earnings on a 78'ths method as in Method No. 1. It disclosed a deficiency in unearned discount and an overstatement of profits in the approximate amount of $1,485,000.00."

22.) The report of Touche recognized that banks employed various methods of recording earnings on consumer loans, usually being variations of either a pro rata straight line recording of such earnings over the term of the loan or computations of earnings based on yield on money in use (78'ths method) report concluded:

"We believe that a method which most closely approximates yield on money in use results is the fairest presentation of earnings and unearned discounts."

23.) On December 22, 1965, Public's directors determined to hire the accounting firm of Ernst & Ernst to review the findings of Touche. This firm made no examination or audit of accounts of Public but in a letter opinion as of December 28th, reviewed the method used by Public in recognizing income on installment loans. This report reflected that Public since approximately 1962 had been recognizing income on installment loans on a "average yield method", leaving in a deferred income account an amount approximately equal to 10 or 11 per cent of the outstanding balance of the installment loans. Such practice according to this report was "reasonable and similar to the practice followed by other banks". This report also suggested, however, that such interest earned on installment loans be reflected on a 78'ths method in the future and proposed that such change be made after January 1, 1966. The opinion of Ernst concluded that the present method be continued on the books through December 31, 1965 to avoid "an abnormal adjusment as of December 31, 1965 which might have serious effect on the bank's image in the financial community".

24.) At the Directors Meeting of Public on December 28th, the Board after considering the reports of both Touche and Ernst & Ernst adopted the recommendations of Ernst & Ernst. The resolution was adopted continuing the present policy of computing earnings on installment loans through December 31, 1965 and providing that starting on January 1st, the 78'ths method be used for all new installment loans made thereafter. The officers of the bank were then instructed to advise interested State and Federal officials relating to this determination.

25.) On January 6, 1966, Mr. Walter F. Finan who was previously elected President and Director of Public upon the resignation of Mr. Hay, read a prepared statement relating to the handling of the unearned income account of Public. It was his position that if Public did not follow the practices recommended by Touche or make a full proper footnote to the December 31st statement as Touche might recommend, he would submit his

resignation. It was Mr. Finan's position that Public's books of account did not properly reflect its true condition and that Public's unearned income on installment loans was presently understated and accordingly its earned income overstated. He stated that an immediate cure should be effectuated by either suitable bookkeeping entries prior to the closing of the books of account as of 1965 or by causing suitable footnotes to be made to the 1965 year end accounting report. Mr. Finan's resignation was accepted at the meeting.

26.) At a Board Meeting of Public on January 10, 1966, a report was made by the counsel of Public relating to his conference with United States District Attorney assistants and further heard from representatives of the two accounting firms, Touche, and Ernst & Ernst. Directors at such meeting then determined to adopt, in effect, Method No. 3 of the Touche report mentioned heretofore which would reflect that by footnote explanation, income of Public Bank had been overstated by $1,500,000.00 on December 31, 1965. The State Banking Commissioner was not present at the meeting and made no recommendation with respect to the action taken by the Board. Concern was expressed by directors relating to the effect of newspaper publicity pertaining to the action of the Board.

27.) Accordingly, the statement of condition of Public Bank for the year ending December 31, 1965, contained a footnote which reflected the Board's action as follows:

"In 1965, the Bank, along with many other state chartered banks, became subject to the regulations of the Federal Deposit Insurance Corporation concerning disclosure of financial information to shareholders and the F. D. I. C. Accordingly, the financial statements for 1964 and prior years have been restated to conform to the presentation used in 1965 which conforms in all material respects with the presentation requirements of the regulations. This restatement increased net operating earnings for 1963 by $170,000 and reduced net operating earnings for 1964 and 1965 by approximately $740,000 and $450,-000, respectively.

"During 1965, the Bank's consumer loan accounting was converted to electronic data processing records. Concurrent with such conversion, an evaluation was made of the Bank's method of recognizing income on such loans. Accordingly, beginning with all loans granted subsequent to January 1, 1966, income will be recognized by a method which provides for a constant yield over the term of each loan, after taking acquisition costs into account. Had this method been applied retroactively, unearned income at December 31, 1965, would have been greater and surplus and undivided profits would have been reduced by approximately $1,500,000."

28.) In addition to the foregoing, it was determined by the directors of Public Bank to amortize the $1,500,000.00 deficiency as reflected in the above mentioned footnote over a period of years by charging it to current earnings computed on the 78'ths method. The first entry of such amortization was made on Public's books in March of 1966. The effect of such amortization program would be to decrease current earnings and in effect divert a portion of such current earnings in order to correct the overstatement of earnings in prior years which was recognized in the footnote mentioned above.

29.) In Public Bank's Statement of Condition as of the close of business on April 5, 1966, the above mentioned footnote was restated except that the undivided profits would have been reduced "by approximately $1,300,000.00" in lieu of the prior estimation of $1,500,-000.00. This difference was due to the amortization which began on March 1966 when Public Bank charged $200,000.00 against current earnings as of April 5, 1966. As of such date no objection was

made to the handling of such unearned interest account by the State Banking Commissioner or any official from the Federal Deposit Insurance Corporation. No demand was then made by any banking public official that Public write off the $1,500,000.00 deficiency instead of amortizing it over a period of years.

30.) During the 15 month period prior to December 31, 1965, Public purchased $29,264,584.21 in gross amount of home improvement installment contracts from two sources. Its purchases however diminished in 1966 when as on August 31, 1966 the bank held a total of approximately $31,500,000.00 of such home improvement installment contracts from the two sources.

31.) Such home improvement installment contracts from one of the sources had more than doubled since February 15, 1965 through March 28, 1966 with an amount in excess of over $10,600,000.00 having been purchased in such period. In most instances such home improvement installment contracts provided for a first payment extending several months in the future which resulted in the fact that no earnings could be applicable to a large number of such contracts purchased, for instance, in the latter months of 1965 regarding earnings for the year 1965. A total of $29,000,000.00 of home improvement installment contracts were acquired within 15 months prior to December 31, 1965 which represented ⅔rds of the total home improvement installment contracts outstanding, acquired from the two sources. In accordance with the year end statement of Public in December 1965, loan earnings in the amount of $3,548,000.00 were recorded from such home modernization installment loans of which 95% was originated from two sources. As of March 28, 1966, Public's books reflected on the assets side, total installment loans of $51,755,588.88 of which $37,686,591.89 were home improvement installment loans. On the liability side there was then unearned income of $5,834,173.82.

32.) The percentage of loans to total assets of Public in 1963 through March 28, 1966, was as follows:

| 1963 | 1964 | 1965 | 1966 to March 28 |
|------|------|------|------------------|
| 60.3% | 66% | 61.4% | 71.6% |

33.) The loan to deposit ratio of Public on March 28, 1966, was 82.1%, an all time examination high. In 1963 the loan to depositor ratio was 67.1%; in 1964 it was 73.2% and in 1965, 68.3%. The state average in 1965 was 59.2%.

34.) Between December 31, 1965 and the commencement of the examination on March 28, 1966, Public Bank suffered a loss of deposits of almost $14,000,000.00 as follows:

| | Time | Demand | Total |
|---|------|--------|-------|
| Dec. 31/65 | $81,444,672.00 | $35,721,594.00 | $117,166,266.00 |
| March 28/66 | $72,695,111.00 | $30,879,864.00 | $103,574,976.00 |

35.) From January 1, 1963 to March 28, 1966, Public Bank had sustained a net loss of $318,134.91. From January 1, 1966 to the date of examination on March 28, 1966, Public sustained a net loss of $440,252.58; which included the absorption of $178,155.00, representing the amortized deficiency in the unearned income.

36.) The examinations of March 28, 1966 by the State Banking Department and by the FDIC, although jointly conducted with relation to schedules and specific accounting data, the conclusions of the separate reports of the Banking Commissioner and the FDIC were separately and independently reached by the respective examiners.

37.) The purpose of the examination of March 28, 1966, as with all examinations, was to as of that date appraise the assets, review the liabilities and review the banking procedures followed thereby permitting examiners to report to supervisory agencies and the directors of the condition of Public.

38.) The respective reports of examination reflect that on the date of examination Public Bank was in an exceedingly serious financial condition. A summary of the FDIC report of Examiner O'Neill stated:

"In spite of repeated criticisms of supervisory authorities and field examiners, management has continued to expand the loan account far beyond accepted banking standards, has continued to extend credit to financially weak borrowers, has continued to extend credit in excessive concentrations to a few borrowers and their interests, has failed to adhere to the basic principles of sound banking of maintaining a normal risk diversification, has continued its weak leading policies, has not formulated a reasonable collection policy, has continued to grant loans with inadequate credit information, has failed to maintain the credit files in a current and satisfactory condition, has failed to effect reasonable recoveries on charged-off assets, has continued to operate "the bank with an inadequate capital account, has failed to recognize operational expenses, has overstated income, has permitted excessive losses in the loan account, has repeatedly disregarded provisions of law and regulations, and has not provided the officer personnel necessary for the supervision of the large loan account which is filled with serious problems.

"Although the board has been repeatedly reprimanded for these deficiencies, it is apparent from the findings of this examination that it has failed to effect corrections and the present condition of the bank discloses that the problems have become more acute and seriously threaten depositor funds."

39.) The report of the State Banking Examiner Miller reflected the following:

"This examination discloses that subject bank is faced with many monumental problems for which there are no easy or readily apparent solutions. Bank has had a troubled history, and the major perplexities now facing the bank center around new, and unresolved asset problems of the past, and management's failure to provide sound earnings, the cumulative effects of which are now endangering the solvency of this institution. Despite the combined past efforts of supervisory personnel to point up dangerous deficiencies and inherent weaknesses, bank's board of directors have initiated few corrections. The more important areas in which the bank as continued to be deficient are outlined below, with detailed comments following:

"(1) *Loans and Discounts*:

　(a) Maintenance of an excessive loan volume.

　(b) Excessive concentrations of credit and lack of diversification relative to individual borrowers, and also with regard to type and source of loans.

　(c) Excessive loan classifications and delinquency.

　(d) Excessive loan losses and an unsatisfactory recovery record.

　(e) Failure to provide for an adequate senior loan staff to grant and properly service an expanded loan portfolio.

"(2) *Earnings*:

　Failure of the bank to generate sound earnings, which are essential to the buildup of adequate loss reserves and maintenance of a strong capital account.

"(3) *Capital Structure*:

　Failure to maintain an adequate capital account in relation to the deposit structure.

"(4) *Liquidity*:

Continued operation of the bank with low liquidity, particularly pronounced at this examination."

40.) With respect to the "excessive loan volume", the ratio of loan to deposits was 82.1%, an all time examination high. During the past three years much of the bank's available funds were channeled into the purchase of home modernization loans from two major sources.

41.) With respect to the "excessive concentration of credit and lack of diversification relative to individual borrowers", the examination revealed loans from five loan sources had grown to 722.3% of Public's total capital and surplus accounts and 50.4% of the total loan portfolio. As of March 1966 over $35 million of a total $51,755,588.88 of installment loans were obtained from two principal sources. With respect to home improvement installment loans in 1963, 99.1% of Public's home improvement installment loans were purchased from one source; in 1964, 93.6% of such loans were purchased from one source; in 1965, 83.3% of such loans were purchased from two principal sources and in 1966, as of the date of examination, 95.1% of such home improvement installment loans had been purchased from such two sources.

42.) With respect to the conclusion that Public had "excessive loan classifications", at the date of examination 46.6% of the total loan portfolio was adversely classified. Such sum was six times the total book capital structure of Public at the date of examination. In bank examining parlance a "classified" loan is one which is deficient and place in one of three categories: "loss", "doubtful", or "sub-standard". A "loss" is when in the judgment of the examiner it is uncollectable or when it meets the statutory requirements of a bad debt. Loans classified as "loss" are charged in full against capital funds. A "doubtful" loan is one which there is serious question as to the collectability and 50% of such doubtful loans are charged against capital funds. A "sub-standard" loan are those not classified as either loss or doubtful but involve more than a normal risk of collectability. No part of a sub-standard loan is charged against capital funds. The FDIC Report of Examination reflected the following table which shows ratios between loans and total assets as well as ratios between adversely classified loans and total loans and book capital:

| | 1963 | 1964 | 1965 | 1966 to Date of Examination |
|---|---|---|---|---|
| Percentage of loans to total assets | 60.3% | 66.0% | 61.4% | 71.6% |
| Percentage of classified loans to total loans | 21.0% | 12.3% | 7.4% | 46.6% |
| Percentage of classified loans to book capital | 199.9% | 133.1% | 89.8% | 637.6% |
| Percentage of loss and 50% doubtful to book capital | 14.9% | 11.4% | 16.6% | 52.3% |

In addition to the foregoing, the total adversely classified installment loans to be differentiated from the total loan portfolio reflected a sum of $35,764,530.05 which was equal to 69.1% of the total installment loans. This sum constituted an amount approximately equal to the total installment loans then outstanding

from the two principal sources. The FDIC Report stated:

"A check of the files discloses the lack of credit worthiness on the very great majority of the borrowings with borderline and weak credits predominating. A review of the past charge-offs in these accounts reflects the deterioration in the quality of the contracts purchased, as the amounts that are being charged off are increasing at a faster pace than the increase in the acquisitions indicating that probable losses still can reasonably be expected to increase further, resulting in staggering charges against capital funds. The loss reserves that were being built up when the accounts were increasing have all been used, and, as the bank has for all practical purposes shut off new acquisitions, there will be little, if any, reserve to absorb the losses that are still to be taken and the charge-offs will have to be out of capital funds."

The report then stated:

"Due to the time lag of approximately a year before the contracts become statutory, the losses for most of 1965 and the first quarter of 1966 have not come to light at this time, since nearly all of the contracts have a delayed first payment of from six to eight months from origination date, after which they do not become statutory until payments are six months past due."

43.) The State Examination Report stated: "To date the bank has experienced a punishing loss experience" on home improvement loans from the two sources. Accordingly, the examiner placed a group classification of "doubtful" to $5 million of such loans causing $2,500,000.00 to be charged against the capital account. The examination concluded:

"there is little doubt that the ultimate losses that will be suffered will far exceed the $2,500,000.00 that is charged against capital account * * * and it is more probable that a loss classification of $5,000,000.00 would have been more appropriate. Likewise,

as a group, these loans are not considered to represent sound banking values and a sub-standard classification is accorded all the remaining contracts."

44.) Aside from the excessive loan questionable classification, the delinquency rate in the loan account was 10.-2% and was 13.1% in the installment loan category. Such rate was more than twice the average in Michigan. To obviate delinquency ratios from an even higher percentage, such loans were "rewritten" or its maturity extended to take it out of the delinquent category. The State Examination Report reflected that past handling of the unearned interest account resulted in a "major understatement of the bank's unearned discount account and conversely a substantially overstatement of earnings in prior years."

45.) Furthermore, the loss reserve ratio maintained by Public were severely criticized by the State Examination Report as was Public's failure to provide for a senior loan staff adequate to serve the increased loan portfolio it had acquired.

46.) With respect to the failure of the bank "to generate sound earnings" on January 1963 to March 28, 1966, Public had experienced a net loss of $318,134.91. As of May 31, 1966, Public had sustained a total book loss of $790,780.67 even though directors injected their own funds in the amount of $360,000.00 to purchase $900,000.00 of charged-off home improvement loans reducing such loss to approximately $440,000.00.

47.) The State Examination Report stated as follows:

"Except to the extent that new deposit money can be attracted, bank will have little reinvestment ability for the remainder of the year. Bank will have a significantly frozen asset condition for many months due to the long-term liquidation provisions that are built into the major block of its earning assets, and any conceivable run-off that will be experienced for the remaining months "of 1966 will be needed to reduce the excessive loan deposit ratio, and pro-

vide for a minimum acceptable level of liquidity.

"The earnings prospects for year 1966 are indeed grim, and it is quite probable that the net deficit for the year will greatly exceed the very substantial true deficit that was experienced in 1965. Bank is faced with the task of liquidating (without benefit of remaining reserves) in excess of $35,-000,000.00 of sub-marginal loans which can reasonably be expected to produce additional losses running several hundred thousand dollars by year end."

48.) With relation to the conclusion that Public had failed to maintain "an adequate capital account in relation to deposit structure", the State Examination Report reflected as of the date of the examination, as compared to the purported book capital account of $6,215,870.62, an adjusted capital account of $1,474,-184.37 determined as follows:

"Total book capital account— $6,216,870.62

Deduct:

| | | |
|---|---|---|
| Assets classified as loss— | $ 729,179.48 | |
| Deficiency in unearned discount— | 1,327,783.50 | |
| 50% of assets classified as doubtful— | 2,685,723.27 | |
| | | 4,742,686.25 |
| Adjusted capital account— | | $1,474,184.37" |

This adjusted capital account represented 1.18% of the quarterly average for the past year of the total assets of Public. The average capital asset ratio for banks in the State of Michigan as of October 13th was 8.01%. A comparable adjusted book capital sum was found by the FDIC examination as of the same date.

49.) As to the conclusion that the bank continued operations with "low liquidity", this Court has previously found that the Public had experienced a flight of deposits of approximately $14 million during the first three months of 1966. In February 1966 Public found it necessary to sell $12,481,000.00 of United States notes and bonds for a book loss of $175,117.40 and had further obtained a line of credit from a New York Correspondent. At the time of examination Public's loan to deposit ratio was 82.1% compared with the average of all banks in Michigan in 1965 of 59.2%. Furthermore, Public had a low liquidity ratio to deposits. Such liquidity ratio is determined by taking the sum of the market value of all securities and cash and money due from other banks and striking a ratio between this sum and deposits. Such ratio at the time of examination was 27.-17% which reflected a decrease of approximately 10% since the 1965 examination and compares to an average liquidity ratio for banks in the State of Michigan in the amount of 49.5 percent.

50.) At the time of examination the Group I and Group II Securities, United States Bonds and Obligations guaranteed by the United States, State and Municipal bonds showed a market depreciation of $1,004,991.80. The FDIC Examination Report stated with respect to this:

"Of further concern is the fact that there is a market depreciation of $1,-004,991.05 in the securities account, which is not reflected in the computations to arrive at the adjusted capital account. Should the bank again be faced with the problem of liquidating assets to meet depositors' demands, as was necessary after the first of the year due to unfavorable publicity, the bank would be threatened with the prospects of additional punishing losses from the sale of securities to meet these demands, which would further

deplete the already impaired capital account.

"Of grave concern is the effect that the present trend in earnings will have on the capital account, since the deficit is growing month by month in substantial amounts, which is further reducing total capital accounts. The overhanging threat of pending losses in * * * (the two sources of installment paper) which willl henceforth have to be charged against capital funds, is cause for serious doubts as to the ability of the bank to cover the expected losses."

51.) The State Report of Examination of March 28th was submitted on June 27th and mailed to Public and its directors about July 19, 1966. The FDIC Report of Examination was submitted on or about the same time. No evidence was offered to reflect that Public, its officers and directors ever made to any State or Federal official any overt objection or challenges to either examination report or to any of the classifications, conclusions or recommendations made therein.

52.) On June 6, 1966, the directors of Public Bank met with the Commissioner and his examiner and certain personnel of FDIC to review the March 28th examination. Copies of schedules from the nearly completed examination report, together with tentative conclusions as to the installment loan portfolios and loan classifications were distributed to those in attendance. The parties reviewed the principal problems of Public. The meeting lasted approximately 13 hours, during which time two directors became very angry, one director accusing the other of "wrecking the bank". Discussion of the flight of deposits, the lack of securities available for future sale, the condition of the installment loan portfolio, the loan classification recommendation and other items were discussed. No evidence indicated the directors then voiced objection to the conclusions submitted to them or disputed any of the reports, conclusions or classifications made in the two examination reports. The Commissioner re-

quested that the Board take positive steps to correct the problem reflecting that what the bank needed was "capital". After a recess the board indicated they would attempt three positive steps:

1. Attempt to get additional capital from the sale of additional stock or debentures to shareholders, or;

2. Put out feelers for a merger, or;

3. Explore the sale of stock to an outside investor.

The FDIC supervisory examiner stated that he would recommend the issuance of a citation under Section 8(a) of the Federal Deposit Insurance Act reflecting unsafe and unsound practices.

53.) On June 28, 1966, the Commissioner sent the Directors of Public a letter pursuant to the Michigan Financial Institutions Act, Section 55, Comp.Laws Mich. 1948, § 487.55, requiring an assessment to be made by Public's Directors on the shareholders in the aggregate amount of $5,747,678.05. The assessment equaled $12.44 per share of Public's common stock to realize the aforesaid delinquent sum stated to be the amount "necessary to restore the deficiency in the capital structure as determined by the examination."

54.) The "capital impairment" was determined from the State Report of Examination computed by adding together loan losses and other asset losses ($729,-179.48), the unearned interest deficiency ($1,327,783.50), 50% of the loans classified doubtful ($2,685,723.27) and the depreciation in the Group I Bond Account ($1,004,991.80) which sum total $5,747,-678.05.

55.) On July 19th the Commissioner again wrote to the Directors of Public stating that it was then mandatory that he require the directors to levy such assessment as outlined in the prior correspondence of June 28th within two months which would then be August 28, 1966. A copy of the Examination Report was enclosed in this correspondence.

56.) No formal objection, challenge or protest was ever received from Public

concerning either the assessment or the manner of computing the impairment nor was any proceeding ever instituted by Public against the Commissioner under Section 21 of the Michigan Financial Institutions Act.

57.) No notice was ever given by the officers or other directors of Public to its shareholders prior to October 11, 1966 relating to the capital impairment and $12.44 stockholder assessment directive.

58.) On July 26, 1966, the FDIC issued to Public and its directors FDIC findings of unsafe and unsound practices and order of correction under Section 8(a) of the Federal Deposit Insurance Act, commonly referred to as an "8(a) Citation". The specific findings of FDIC stated in the 8(a) citation were as follows:

"1. The continued operation of the bank in an unsound and hazardous condition with a seriously impaired capital account, the impairment at the close of business on March 28, 1966, being such as to exhaust entirely the bank's undivided profits and surplus and to impair its common stock substantially;

"2. The continued operation of the bank with an adjusted capital account which is inadequate in relation to the kind and quality of assets held by the bank;

"3. The continued pursuit by the bank of lax credit, lending and collection policies and practices, including but not limited to (a) the carrying of an excessive volume of adversely classified loans, (b) the carrying of an excessive volume of loans, (c) the failure to diversify the loan portfolio, (d) the carrying of excessive concentrations of credit, (e) the failure to take aggressive and effective action to collect problem loans, including charged-off loans, (f) the carrying of an excessive volume of overdue loans, and (g) the maintenance of deficient credit files;

"4. The continued failure of the directors of the bank to provide an adequate loan administrative staff;

"5. The continued failure of the directors and officers of the bank to exercise proper control over income and expenses and accounting procedures of the bank, as a result of which the bank's reported earnings have been overstated and some of its expenses under-stated;

"6. The continued failure of the directors and officers of the bank to observe and comply with, and their knowingly or negligently authorizing or permitting violations of provisions of law to which the bank is subject, including sections 74 and 91 of the Michigan Financial Institutions Act;

"7. The continued failure of the directors and officers of the bank to heed the criticisms and warnings and to comply with the recommendations of this Corporation and the Michigan State Banking Department and their respective examiners."

59.) Corrective measures were specified in the 8(a) citation which if not completed within 120 days, being November 28, 1966 (or such shorter period as the State Banking Commissioner might designate), would result in steps being taken toward the termination of its status as an insured bank. Such corrective measures included that Public must:

1. Charge off all assets classified as loss on its accounting statements;

2. Charge off at least 50% of its assets classified as doubtful on its accounting statements;

3. Proceed diligently to eliminate the remaining 50% of doubtful assets and reduce by at least 50% the sub-standard assets on its accounting statements;

4. Reduce the volume of large concentrations of credit and diversify the loan portfolio;

5. Provide additional experienced loan administrators at the executive level;

6. Make appropriate entries to correctly reflect interest collected but not earned;

7. Place the assets of the bank in a form and condition acceptable to the Commissioner and the FDIC and that the bank provide an adjusted capital account of not less than $6,216,870.00.

60.) On July 28, 1966, the Michigan State Banking Commissioner extended the time for Public's Board to value the assessment to the shareholders as set forth in the assessment letter previously referred to for an additional 120 days or until November 28, 1966, to conform to the citation deadline imposed by the FDIC. This extension, however, was given with three conditions:

1. That a written plan for correction of the capital impairment be provided to the Commissioner's office within 10 days;

2. That reports be submitted to the Commissioner's office on the 1st and 15th day of each month beginning August 15, 1966 concerning progress on the corrected measures required by the FDIC, and;

3. That a signed copy of the general ledger, daily statement of bank be submitted to the Commissioner's office each day for the previous day's close of business effective immediately.

61.) The first condition was not complied with by Public.

62.) Prior to October 11, 1966, the directors of Public never gave notice to its shareholders of the 8(A) citation received from FDIC. Of approximately 13,500 banks insured by the FDIC in 1966, only two or three 8(A) citations were issued during that year.

63.) The Michigan State Banking Examination of March 28th reflected that the bank had overstated its earned interest income on the home improvement installment contract notes by $1,500,000.00, less the monthly amortization which was commenced in March of 1966, and further, that an amount of over $2,600,-000.00 must be adjusted on the capital account of the bank as representing 50% of such loans classified as doubtful.

64.) With respect to conclusions reached regarding the home improvement installment contracts by the examinations, no investigation was made into the solvency of the individual makers of the notes.

65.) During the spring and summer of 1966, the bank in attempting to correct their difficulties, hired new experienced people, opened a new branch, attempted to reduce the installment loan portfolio, particularly cut off purchasing home improvement installment loan contracts and initiated efforts to increase its deposits. Furthermore, the Board of Directors of Public Bank attempted to find solutions to the problems by actively pursuing the points it outlined following the meeting of June 6, 1966 between the Commissioner, his staff, personnel of FDIC and the Public Bank Directors.

66.) Attempts to merge or re-capitalize were made on or about July 25, 1966 when Mr. Leemon, President of Guardian Savings & Loan Association met with Commissioner Slay and officers of Public to explore such possibility. No plan to recapitialize resulted.

67.) In July of 1966, some discussion was had between Public's President and representatives of Michigan Bank concerning a merger. No plan evolved as the discussion was brief and principally related to the quality of Public's assets. Public's President reported the discussion to Public's Board.

68.) Following negotiations Public and City National Bank entered into a merger agreement on August 5, 1966, which was conditioned upon a review of the assets and an audit to be made of Public.

69.) On August 10, 1966, City Bank's President visited Washington, D. C. and called upon the FDIC and the office of the Comptroller with relation to the proposed merger. At the FDIC meeting, City National Bank was first advised of the State Banking Commissioner's required assessment of $12.44 per share payable on or before November 28, 1966, and that the FDIC had issued its 8(a)

citation. A general view of the Comptroller's representatives was a negative one with respect to the proposed merger.

70.) Accordingly, on August 16, 1966, City National Bank withdrew from the merger reflecting four reasons:

1. Failure of Public Bank to disclose to City National Bank the $12.44 per share assessment;

2. Failure of Public to disclose to City National Bank the issuance of the 8(a) citation by the FDIC;

3. The liklihood that the comptroller would not approve in view of expressions made by the comptroller's agents at the Washington, D. C. meeting, and;

4. It had come to the attention of City National Bank that a substantial number of Public stockholders had expressed dissatisfaction with the proposed merger and that such stockholders were threatening legal proceedings to prevent consolidation.

71.) Following the withdrawal by the City National Bank from its merger agreement, a proposal for recapitalization was proposed to Public by Directors Mebus, Sr. and Mebus, Jr., on August 16, 1966. Such proposal, however, was withdrawn on August 25, 1966.

72.) Upon the withdrawal by City National Bank from the proposed merger with Public, FDIC officials became acutely concerned about the consequences of a failure of a bank the size of Public in the same city where the bank holiday of 1933 began. On August 22, 1966, the State Banking Commission and FDIC placed examiners on Public's premises to closely review the bank's activities and follow through with respect to the said citation. Such personnel remained on the premises of Public until October 11, 1966.

73.) During the week of August 21, 1966, Mr. Randell, Chairman of the Board of Directors of FDIC and Mr. Roddy, the Deputy Chief of the Division of Examination of FDIC, came to Detroit and called upon five of the six commercial banks to discuss the problems confronting Public and its inter-relation with the other banking institutions in the area. Representatives from each of these banks were very much aware of the financial condition of Public. The National Bank of Detroit and the Detroit Bank & Trust Company reflected to the FDIC representatives that they had no interest whatsoever in merger or acquisition. Michigan Bank representatives expressed an awareness of the community responsibility and reflected that Michigan Bank would join other Detroit banks where possible, acting in concert to assist. No further contact was made with Michigan Bank. FDIC representatives clearly indicated to National Bank and Detroit Bank officials that FDIC could render assistance if acquisition were to be made by such bank. Such offer was not recalled by the President of Michigan Bank, if it was made. In discussions with Manufacturer's National Bank representatives, FDIC officials suggested if there was any interest in the acquisition of Public that Public's management should be contacted and that the FDIC could render assistance if some acquisition plan were to be feasible. Representatives from the Manufacturer's National Bank, following a meeting, proposed a possible acquisition of Public with a premium up to $1.5 million provided that the FDIC agreed to place with Manufacturer's National Bank a $25 million liquidity deposit and guarantee such bank against losses without limit as to amount. FDIC representatives indicated that the offer was probably beyond the FDIC's legal ability in terms of assistance but suggested that further contacts be made between representatives of the two banks. No further steps toward acquisition were taken by Manufacturer's National Bank. The visit by the FDIC representatives to Commonwealth reflected an expression by that bank of interest in acquiring Public, providing that a sufficient FDIC assistance could be obtained. The Commonwealth officials expressed concern for the impact on Commonwealth if Public Bank failed. The representatives of FDIC did not contact City National Bank officials as a "judgmental decision" was

made prior to the visit to Detroit that this bank was not a prospective candidate in view of the recent withdrawal of the proposed merger between the two banks. The President of City National Bank, however, was aware of the presence of the FDIC representatives during their visit in Detroit and of the fact that other banks were called upon by these representatives.

74.) The records of Public disclose that there was a downward trend of deposits made with Public in the amount of approximately $24 million from December 31, 1965, to October 11, 1966.

75.) The following figures were taken from exhibits received in evidence which reflect such downward trend of deposits over such period as follows:

| Date | Time Deposits | Demand Deposits | Total Deposits |
|---|---|---|---|
| 12/31/65 | $81,444,672 | $35,721,594 | $117,166,266 |
| 3/28/66 | 72,695,111 | 30,879,864 | 103,574,976 |
| 4/5/66 | 73,695,377 | 33,143,477 | 106,838,854 |
| 6/30/66 | 75,229,653 | 32,415,949 | 107,645,602 |
| 8/26/66 | 73,213,681 | 27,166,163 | 100,379,844 |
| 9/20/66 | 70,760,406 | 26,004,679 | 96,765,085 |
| 10/7/66 | 68,459,424 | 25,825,907 | 94,285,332 |
| 10/11/66 | 68,155,227 | 24,797,414 | 92,952,642 |

On October 7, 1965, Public's total deposits were $115,804,936.97 as compared to Public's total deposits on October 7, 1966 in the amount of $94,285,332.00. Accordingly, Public experienced a loss of over $21.5 million during this one year period. From September 20, 1966 to October 7, 1966, total deposits declined almost $2.5 million.

76.) Deposits would fluctuate in accordance with Public announcements in view of the fact that rumors were known in financial and other circles throughout Detroit regarding the condition of Public. Such caused an effect on deposits.

77.) Hard work on behalf of the Public reflected an increase in total deposits during the spring of 1966, later falling off during the summer and fall as merger, consolidation and recapitalization possibilities appeared and then disappeared. Mr. McGuire, President of Public Bank, reflected on August 26, 1966, that in view of inordinate deposit withdrawals from Public, he would be surprised if Public could make it through the week.

78.) The foregoing reflection of a downward trend of deposits occurred irrespective of the fact that prior to October 11, 1966, Public had not yet advised shareholders or depositors pertaining to the assessment requirement of $12.44 per share, the FDIC 8(a) citation nor the unpublished condition report of September 20, 1966, which will be covered hereafter.

79.) On August 26, 1966, Public had insufficient funds to meet its clearings at 11:00 o'clock a. m. and did not meet them until two and a half hours later after borrowing from the Federal Reserve in the amount of $500,000.00. Also, during the afternoon of August 26, 1966, a major depositor demanded cash in certain denominations for its deposit balance in the approximate amount of $263,000.00 which occasioned a second Federal Reserve borrowing on that date in the amount of $500,000.00.

80.) Public was not a member of the Federal Reserve System. This was the first time in the history of the Federal Reserve System a non-member bank had

borrowed funds from the Federal Reserve. Such borrowing is permitted from the Federal Reserve to non-member banks only under "unusual or exigent circumstances". The Commissioner of Banking of the State of Michigan, together with FDIC officials, assisted Public to obtain the borrowing achieved on August 26, 1966, one and a half months prior to the initial court action.

81.) From August 26th until October 11, 1966, Public borrowed daily from the Detroit branch of the Federal Reserve Bank of Chicago, the net borrowings increasing over this period of time from $1 million to $9,500,000.00 which was owed as of October 11, 1966. During this period of time Public at times would make repayments of such borrowings and then have the need to borrow again. The borrowing was required to meet Public's liquidity requirements including the withdrawal of deposits heretofore reflected during the months of August, September and October, 1966. Such borrowings obviated the necessity of Public to sell its government securities which otherwise would have caused loss to Public on the actual sale of such securities on the market.

82.) The interest rate paid on the borrowings by Public from the Federal Reserve System was 5½%. The U. S. Government Bonds pledged as security had an average yield of 4%. Bonds were pledged with the Federal Reserve on a basis of 90% of the market value of such bonds. Later the loans were made on a basis of 95% of market value of the bonds based on bid prices. Beginning September 23, 1966, the notes given by Public to Federal Reserve were 24 hour notes and each note would have to be renewed each day.

83.) During this period there were no other lines of credit or borrowing available to Public with the exception of an offer made by a Mr. Zimmerman on September 29, 1966, which offer was not accepted in view of its terms. Such borrowings enabled Public to meet its liquidity demands caused by deposit withdrawals without liquidation of the bank's loan portfolio.

84.) During this period of time there were days from August 26th through October 11th when Public was unable to meet its clearing except for such borrowings from the Federal Reserve. As of October 11, 1966, Public had from $2.5 million to $3 million worth of U. S. Government Bonds still available and eligible as security for continued borrowings at the Federal Reserve.

85.) In addition to the general decline of deposits, Public Bank sustained a total net loss from the period of January 1st to October 11, 1966, in the amount of $1,639,093.19. A monthly amortization with respect to unearned income which commenced in March 1966 through September 1966, totaled $486,715.00. Subtracting such amortizations from the total loss results in a loss not counting the amortization of $1,152,378.19.

86.) State and FDIC examiners which were on the scene from the middle of August through October 11, 1966, prepared the following documentary information in connection with their continued examination of Public during this period:

A spread of Public's daily condition from July 31, 1966 to October 11, 1966;

A graph of Public's principal asset and liability accounts from July 31st to October 11th with notations concerning events;

A list of Public's borrowings from July 31st to October 11, 1966;

A schedule of Federal Reserve borrowings from October 11, 1966 to October 12, 1966;

Figures on operating income and expenses for Public from January 1st to October 11, 1966;

A list of pledged securities.

Furthermore, other documents prepared by Public Bank employees were considered by the State and FDIC personnel re-

garding their continuing examination, including:

Daily statements from July 31st to October 7, 1966;

Public's General Ledger;

Proposed proxy statements;

The unpublished call report of September 20th;

Print outs of large deposits and withdrawals, and;

Schedules of uninsured deposits.

87.) In considering this information made available to the State and FDIC examiners, based upon a review of material being prepared by the accounting firm of Touche, Ross, Baily & Smart which began an audit of Public assets on August 27th, the FDIC examiner concluded that more properly the $5 million of installment loans should have been classified "loss" rather than "doubtful" which would have increased the charge against Public's capital funds by an additional $2.5 million. No official action was taken, however, in this regard.

88.) During the latter part of September and October. Public held back the publication of the monthly September call report. Such call report was never published prior to October 11, 1966. On September 30, 1966, Public retroactively as of August 31, 1966, accepted the loan classifications made by the State and Federal examinations and also wrote off the remaining unamortized portion of the $1.5 million deficiency in unearned interest (approximately $1,014,000.00) thereby reflecting upon its records the classifications and recommendations of the two examination reports. Such was a condition of the 8(A) citation and was necessary to obtain FDIC approval of a proposed proxy statement.

89.) The aforesaid "condition report" is required by law to be published in a newspaper of general circulation. On October 6th, pursuant to the Commissioner's call, Public submitted such a report as of the close of business on September 20, 1966. It was received by the Banking Department on October 7. All other banks in Detroit by that time had published their statements of condition and the fact that Public had not yet published its statement was a subject of comment in the financial community.

90.) The April 5, 1966 call report of Public reflected a capital account of $5,113,101.90. The statement of condition of June 30th of Public Bank which was published showed a total capital account of $5,996,680.41 as follows:

| | | |
|---|---|---|
| Common stock | – | $4,620,000.00 |
| Surplus | – | 1,100,000.00 |
| Undivided profits | – | 276,680.41 |
| | | $5,996,680.41 |

In contrast the unpublished September 20th statement of condition showed a total capital account of $967,254.96 reflecting a decrease of over $5 million from the capital accounts previously stated less than three months before. The makeup of the capital account as of September 20, 1966, was as follows:

| | | |
|---|---|---|
| Common stock | – | $4,620,000.00 |
| Surplus | – | 1,100,000.00 |
| Undivided profits Deficit | – | (4,752,745.04) |
| Total capital accounts | – | $ 967,254.96 |

91.) The June report was signed by officer Charles Scribner and directors James McGuire, Bernard Youngblood and Emmett Tunney. The unpublished September 20 condition report dated October 6, 1966, was signed by officer Charles Scribner and directors James McGuire, Chester Meldrum and A. H. Moorman.

92.) Great concern over the effect on deposits and other stability factors of Public which would be precipitated due to the publication of the proposed September 20th report of condition was one of the primary points considered by the State Banking Commissioner at the time he determined to apply for the appointment of a receiver on October 11th.

93.) In response to the FDIC officials suggestions and offers of assistance, Commonwealth officials promptly commenced negotiations with Public officials for the purchase of Public during the last few days of August, 1966. Commonwealth engaged the accounting firm of Touche, Ross, Bailey & Smart (Touche) to conduct an examination of Public over the weekend of August 26, 1966, the results of which were reported to Commonwealth the following Sunday and Monday. Such initial report formed a basis for negotiations with Public as well as Commonwealth's demands for a guarantee and other FDIC assistance. Such report also was considered by FDIC in setting the limits of assistance.

94.) Commonwealth and Public negotiated an acquisition agreement first in preliminary form on August 29, 1966 and then in formal fashion dated September 1, 1966. This agreement between Public and Commonwealth provided for a premium to Public for its "going concern" value in the amount of $550,000.00 for the right to do business at the banking house branch locations together with a 2% premium on demand deposits and one half of 1% premium on all other deposits.

95.) The initial agreement between Bank of the Commonwealth and Public Bank of August 29, 1966, was signed by the following directors of Public: McGuire, Moorman, Kotcher, Mebus, Sr., Granader, Youngblood, Meldrum, Harris, Burke, Tunney. The formal bank-to-bank agreement dated September 1st between Public and Commonwealth was signed and approved at a Board meeting of the Public Directors by the following Directors of Public: McGuire, Burke, Mebus, Sr., Mebus, Jr., Kotcher, Meldrum, Benway, Moorman, Harris. The largest individual shareholder of Public, Philip Mebus, Sr., consented and approved the sale and purchase contemplated in the Commonwealth-Public Agreement dated September 1, 1966, and agreed further to execute and deliver to Commonwealth an irrevocable proxy by himself and each member family to vote for confirmation and approval of said agreement.

96.) Commencing shortly after the bank-to-bank agreement was prepared on September 1, 1966, the FDIC and Commonwealth representatives had numerous arm length negotiation sessions that eventually culminated in two agreements being Agreement A and Agreement B of September 19, 1966.

97.) Agreement A is the so-called support agreement for the "Bank-to-Bank Agreement" between Commonwealth and Public dated September 1, 1966. Agreement A reflects the method of appraising assets and recognizing liabilities of Public for the purpose of measuring Commonwealth's right to charge FDIC a $10 million guarantee fund established under that agreement to support the bank-to-bank contract. Originally Agreement A contained provisions for valuating assets and recognizing liabilities which were different in parts from the original agreement between the two banks dated September 1, 1966.

98.) Agreement B is the so-called "standby agreement" relating to the method of appraising assets and recognizing liabilities in the event FDIC should be appointed receiver for Public and a Court should approve a sale by the receiver to Commonwealth. Agreement B embodied a $10 million guaranty fund and in this respect as with respect to the asset appraisal formulas was parallel to Agreement A. Agreement A contemplated a direct purchase by Commonwealth from Public with Public stockholder approval. Agreement B contemplated a similar acquisition but through the route of involuntary receivership with Court approval.

99.) After execution of these agreements on September 19, 1966, Commonwealth officials actually executed the agreement between the two banks which was dated as of September 1, 1966.

100.) The Agreement B between FDIC and Commonwealth was initiated at the insistance of the FDIC as an alternate

route to effectuate the continued operation of Public in case the basic bank-to-bank agreement between FDIC and Commonwealth could not or would not be effectuated.

101.) On September 30, but effective September 23, 1966, the two banks amended their September 1 agreement so that it was exactly parallel to the terms of sale under the contingent receivership agreement, Agreement B, except for a 15 day difference as to the time for calculating the premiums on deposits. Such difference was negotiated between Commonwealth and FDIC and placed in Agreement B to account for expected deposit attrition incident to a publicized receivership deferring the premium computation date until 15 days after the receivership sale, in lieu of such computation being made as of the day preceding the closing date.

102.) At a special meeting of the Board of Public on October 3, 1966, the following Directors approved the amendment dated September 23 to the agreement dated September 1, 1966 with the Bank of the Commonwealth: Bruce Benway, C. John Burke, Harry Granader, Charles Kotcher, James McGuire, Philip Mebus, Jr., Chester Meldrum, A. H. Moorman, J. Emmett Tunney. Louis Berry abstained from voting. Philip Mebus, Sr., and Bernard Youngblood were absent.

103.) Copies of Agreements A and B were delivered to counsel for Public Bank. The details of both Agreements A and B between Commonwealth and FDIC were known by Mr. McGuire, President of Public, Mr. Moorman, Bruce Benway, Chester Meldrum, L. Paul Dixon and by each member of Public's Board of Directors that was in attendance of the Board meeting September 20, 1966. By its terms, Agreement B excuses performance by Commonwealth if a break in normal business operations of Public occurs. These persons were aware that Agreement B contemplated an involuntary receivership with an immediate takeover of Public as a going concern without any break in the performing of banking business. Relief was expressed by Public's President that in either event, the consolidation under Agreement A or Agreement B, Public's depositors would be fully protected.

104.) A Commonwealth-Public merger was announced to the public from September 23rd to September 26th and the FDIC guaranty fund was reflected in the resultant publicity and news articles.

105.) In order that Agreement A become effectuated, it was necessary by agreement and under law that such proposed purchase be approved by Public's stockholders. Originally an October 3rd date of closing was established. Subsequently, by amendment executed on September 30th but dated September 23rd, the closing date was set at October 14, 1966, at which time all conditions precedent, including the shareholders approval, must have been completed.

106.) In order to obtain approval of its shareholders, it was necessary for Public to submit a proxy statement for the shareholders at a shareholders meeting to be called to consider such approval of the proposed agreement. Such proxy material was subject to the prior approval by the FDIC under the Full Disclosure Act. The State Banking Commissioner had no jurisdiction or authority with respect to the approval of the proxy statement.

107.) Public encountered difficulties in the preparation of a proxy statement to be sent to Public shareholders regarding the proposed merger. One of the primary problems with respect to getting the proxy out was the inability of Public's management and the accountants, Touche, to agree upon an appropriate loss reserve. Public's inability to assemble a proxy statement was one of the reasons that the closing date with Commonwealth was extended until October 14, 1966. As this new date approached the proxy material was not completed in satisfactory form. Accordingly, Public amended its by-laws to shorten the time of notice for a share-

holders meeting from ten to seven days. By Friday, October 7th, Public was still unable to produce an acceptable proxy statement. Its Board of Directors then resolved that on October 14th Public would hold a shareholders meeting nevertheless to advise the shareholders of the bank's condition.

108.) At least six drafts of some proposed proxy material were submitted. The State Banking Commissioner attempted to assist by urging Public officials to complete their work on the proxy material and by checking with FDIC to ascertain that this agency was doing everything it could to clear such material.

109.) On October 6, 1966, a telegram was sent by the President of Public to the Commissioner stating:

"IN VIEW OF RECENTLY DEVELOPED ACCOUNTING PROBLEMS REQUEST YOU USE YOUR GOOD OFFICES TO SOLICIT REASONABLE EXTENSION OCTOBER 14 DEADLINE AS STATED IN PARAGRAPH 11G OF OUR SALE AGREEMENT TO OCTOBER 28 STOP THIS REQUEST IS CONSIDERED URGENT STOP IMMEDIATE REPLY REQUESTED

"SIGNED: JAMES H. MCGUIRE PRESIDENT PUB"

110.) Commissioner Slay met with the Bank of the Commonwealth President to attempt to extend the October 14th deadline. Such request did not achieve the extension.

111.) On October 11th Touche sent a telegram to Public disassociating themselves from the preparation of the proxy. Knowledge that such telegram would be sent was received by the Commissioner on the previous day. The telegram stated as follows:

"Charles D. Slay, Commissioner of Banking, State of Michigan, Davenport Bldg. 144 West Ottawa St. Lansing Mich.

We have withdrawn as accounting consultants to Public Bank of Detroit stop in assisting Public Bank in the preparation without audit of the financial statements of Public Bank and the pro forma balance sheets of Public Bank and Bank of the Commonwealth for inclusion in a proxy statement of Public Bank relating to a proposed sale of its assets to Bank of the Commonwealth. We have a substantial disagreement with Public Bank as to the extent of the disclosure which should be made in its proxy statement as a result of our belief that allowances in the liquidation of loans of Public Bank will exceed by a very substantial amount the allowance of $3,329,683 "provided in the financial statements referred to above stop in our opinion, the disclosure relating to this matter in the October 10, 1966 printer's proof of Public's proxy statement is inadequate stop accordingly, we disassociate ourselves from, and disclaim any responsibility for, the financial statements which may appear in such proxy statement.

Touche, Ross, Bailey & Smart."

112.) On October 7, 1966, minutes of Public's Board reflected the following:

"Due to the failure of receiving final clearance of the proxy material by the Regulatory Authorities, the Bank has been placed in the position of not being able to give the shareholders, in accordance with our By-Laws, sufficient notice of a shareholders meeting to be held on October 14, 1966; also failure to receive an extension of time beyond the October 14, 1966 date in accordance with the Bank's Agreement with the Bank of the Commonwealth * * * "

113.) The Cashier of Public concluded prior to October 11th that it would have been impossible to complete the agreement with Commonwealth under the proposed bank-to-bank agreement supported by Agreement A between the FDIC and Commonwealth since the proxy material could not be approved in time for notice and for a meeting of the Public Bank shareholders.

114.) As of October 11, 1966, and including that date, there was but four days until October 14th, the deadline under the purchase agreement between the Bank of the Commonwealth and Public Bank. The amendment of the Public Bank By-Laws shortened the time of notice for a shareholders meeting from ten to seven days. Time in which such a meeting could be called for stockholder approval of the agreement based on a proxy statement that had not as yet been completed or approved by the FDIC had expired.

115.) The last draft of the proposed proxy statement which had yet to be finally approved by the FDIC and over which the aforesaid controversy occurred between the Touche accounting firm and the Public officials, reflected certain information which was to have been submitted to the shareholders of Public Bank. This proposed proxy statement recommended to shareholders to approve the sale terms to the Bank of the Commonwealth and in making reference to alternatives to the proposed plan stated as follows:

"Due to the fact that the Bank is in an impaired capital position as outlined above, and in the absence of any sound recapitalization (such as a merger with another banking institution or the guaranteed underwriting of a new stock issue), the alternatives which are available to the stockholders are: meeting the assessment of the State Banking Commission of $12.44 per share as has been described, or an involuntary receivership. The Agreement with the Bank of the Commonwealth, requiring the orderly processing of the Bank's installment loan portfolio to reduce losses and assumption of substantially all of the Bank's liabilities, appears to management to be a better alternative than an involuntary receivership."

116.) In addition the proxy generally reflected the following three charges made against the capital accounts in the examination reports of March 28, 1966, as follows:

| | |
|---|---:|
| Projected losses on installment loans | $2,700,000.00 |
| Projected losses on commercial loans | 625,000.00 |
| Overstatement of earnings | 1,500,000.00 |
| Total charged to undivided profits | $4,825,000.00 |

In addition, disclosure was first then to have been made to stockholders of the Commissioner's action with respect to the capital impairment and the direction of an assessment against each shareholders share in the amount of $12.44 as well as the FDIC 8(a) citation letter of July 26, 1966. Finally the proposed proxy also reflected the various unsuccessful efforts to restore the capital of the bank or to effectuate a new stock issue, the preliminary agreement entered into for a merger of Public with City National Bank, and, the so-called Zimmerman or Capital Banc Shares proposals, all of which latter proposals were not accepted at any time by the officer or directors of Public Bank.

117.) Commencing September 23, 1966, and continuing through October 7, 1966, four offers for recapitalization were presented to Public by Capital Banc Shares and S. Mort Zimmerman who controlled the said company. None of these four proposals were acceptable to the Commissioner as they did not provide new capital for the bank and failed to comply with the requirements of law in the opinion of the Commissioner's staff. In addition, Mr. Roddy, Deputy Chief of the Division of Examination of FDIC concluded that these four proposals did

**150**

not make adequate provision for the bank's needs in that they infused no new capital, that in effect the shareholders were asked to give away one half the bank for nothing, that the proposed segregation of reserves for the benefit of capital notes was contrary to good practice, that a proposed limitation of write-off of loss and doubtful loans to ½0th per year was contrary to good practice, and a credit of all collections on installment loans to principal and none to income would provide no operating funds for the bank. In the opinion of the cashier of Public, Mr. L. Paul Dixon, the Zimmerman proposals offered nothing.

118.) At no time were these proposals accepted and approved by the Board of Directors of Public. Both the second Zimmerman proposal and its rejection were included in the proposed proxy statement of Public.

119.) On October 7, 1966, Commissioner Slay met with Mr. Irwin J. Kasoff at the request of Mr. Kasoff, who made inquiry as to what would be necessary to come up with an acceptable offer to alleviate the distressed financial condition of Public Bank. In response Commissioner Slay indicated that "he was no school teacher", that if an offer were to be made that he would review such offer. No additional specific offer was submitted prior to October 12, 1966.

120.) It was understood between the FDIC and Commonwealth if Public received a better offer after the bank-to-bank agreement was completed between Public and Commonwealth, Commonwealth would step aside. Furthermore, if such better arrangement became available to Public, both parties, FDIC and Commonwealth, would disassociate themselves from Agreements A and B between such two parties. No better agreement or proposal, however, was offered or obtained by Public during the month of September and to October 11, 1966. The FDIC negotiated with no other prospective purchaser after September 19, 1966.

121.) As of October 11, 1966, Public Bank was in a very poor liquidity position. The total book capital accounts of Public were $936,116.01. The total deposits were $92,952,642.00. The ratio of capital funds to deposits was approximately 1%. Furthermore, the loans of Public on this date totaled approximately $81.5 million against approximately $93 million in deposits. The resulting loan deposit ratio was then almost 88% as compared with the 82% found during the March 28th examination and against the approximately 59.2% being the average of all banks in Michigan in 1965. In addition, the installment loan portfolio was almost $46 million of which Public in its proposed proxy admitted $31,550,000.00 were sub-marginal loans. Although $2.7 million were acknowledged by Public and accordingly liquidated, Touche expressed a belief that the losses in the liquidation of loans would exceed "by a very substantial amount" the aforesaid allowance recognized by Public. Finally, the book value of cash and securities on October 11th was $17,892,800.00 whereas total deposits were then $92,-952,642.00 resulting in a liquidity ratio to deposits of 19.1% reflecting a further decline from the low ratio of 27.17% found at the March 28th examination.

122.) Then officials of the State Banking Department and FDIC were seriously concerned that Public Bank would fail at any time. They concluded a devastating "run" on the bank was eminent. FDIC officials were concerned that if Public Bank failed it would have serious adverse effects on other banking institutions in the area, particularly Commonwealth which at the time was a $500 million insured bank.

123.) As of October 11, 1966, it was estimated by the State Banking Commission officials and FDIC officials, together with the cashier of Public Bank, that there were uninsured deposits totalling approximately $10,000,000.00 in Public Bank. Both the Board of Directors of Public Bank and the Commissioner reflected concern over such depositors.

Uninsured depositors are those for which there is no obligation on the part of FDIC to pay as insurer in the event the bank could not be able to pay the deposits in full. If Public Bank were closed and there was no assumption of deposit liabilities, the uninsured depositors would not receive payment, if at all, until after the assets had been liquidated and only then they would receive their pro rata share of such liquidation. There would be no disbursement to the uninsured depositors during the liquidation process and such funds accordingly would be immobilized during this period.

124.) As of October 11, 1966, the liabilities of Public exceeded its assets by $1,347,084.36. This deficit sum was arrived at by the following foremat:

| | | |
|---|---:|---|
| Total capital account on October 7, 1966, per books of Public Bank | $ 942,034.90 | |
| Less market loss on U. S. Government securities per bid prices in Wall Street Journal as of 10/10/66 | −933,594.00 | |
| | $ 8,440.90 | (Deficit) |
| Less market loss on municipal securities per pricing of 9/6/66 | −186,850.00 | |
| | $ 178,409.10 | (Deficit) |
| Less market loss on FHA real estate mortgages per Federal National Mortgage Association prices as of 10/10/66 | −1,168,675.26 | |
| | $1,347,084.36 | (Deficit) |

———◆———

Subsequent testimony of the State Banking Examiner during the April 6th hearing revised the foregoing deficit sum arriving at a figure of $1,362,779.20 which sum was approximately a $15,000.00 greater deficit based upon a correction in certain clerical errors made in the pricings of October 11th. It is recognized that banks may carry on their books the U. S. securities, municipal securities and FHA mortgages at amortized costs and not at market value, although the latter value reflects the actual work of such securities at a particular time.

125.) No appraisal of Public's real estate was made with respect to the figures presented to the Court that claimed the fair market value of the assets were exceeded by the liabilities as of October 11th. However, the minutes of Public Bank of December 9, 1965, stated three of the real estate properties were appraised at a sum very close to the stated values on the books (of Michigan Shelby Realty Company) at that time. The improved real estate of Public (held by Michigan Shelby Realty Company) in August of 1966, was over stated on the books of that corporation by $500,000.00 according to a statement made by the President of Public to the President of Commonwealth.

126.) With respect to United States and other bonds as of the March 28th Examination Report, Public's securities were in the following categories with respect to maturity dates:

| | |
|---|---|
| 1 year and less to maturity | – 0% |
| 2 to 5 years to maturity | – 34% |
| Over 5 years and less than 10 years to maturity | – 61.2% |
| Over 10 years to maturity | – 4.8% |

No objection or challenge was ever made by Public officials to the Commissioner's

calculation in its capital impairment letter of July 19th which set bond depreciation Group I at $1,004,991.80.

127.) Public on October 11th met its obligations in the ordinary course of the conduct of its business and did not refuse to pay its deposits or obligations in accordance with the terms under which said deposits or obligations were incurred.

128.) In addition, Public met the demands of all of its depositors in accordance with the terms under which such deposits were incurred and met and satisfied its bank clearings as of October 11, 1966. Public furthermore had sufficient funds on deposit with its clearing house representative to meet and satisfy its bank clearings on October 11, 1966.

129.) The Commissioner on October 11, 1966, just before noon, made a determination to apply to the Court for the appointment of a receiver for Public. It was the intention of the Commissioner to follow through under the terms and provisions of Agreement B between the FDIC and the Bank of the Commonwealth if the Court were to approve the appointment of FDIC as receiver.

130.) As there was extreme concern over the possibility of premature publicity which could have defeated the purpose of proposed Plan B to have uninterrupted bank operation, only representatives of the State Banking Commission, the FDIC, Bank of the Commonwealth and their respective counsel were advised. No notice was submitted to any officer, director or representative of Public. The petition was filed and the hearing commenced as previously outlined and found.

131.) The first notice to Public of action taken under Plan B in court was submitted by a telephone call at approximately 2:00 a. m. to Mr. McGuire, President of Public Bank. The cashier of Public Bank was advised by the President shortly thereafter. The cashier indicated he expected this action would occur although was surprised as to the hour and time of notification. Upon the order being approved appointing the FDIC receiver, appointing counsel for the receiver and approving the proposed receiver's sale agreement, immediate steps were then taken to effectuate a transfer of the assets of Public and the assumption of the liabilities in accordance with the receiver's sale agreement. No steps were made to attempt to effectuate a transfer under the Agreement B until Commissioner Slay made his determination shortly before noon on October 11, 1966. Commonwealth contacted the Naegele Outdoor Advertising Company, Inc. during the evening of October 11 and requested preparations be made for sign changes to be made the next day. Promptly on October 12th the signs on the Public locations were changed to that of Commonwealth.

132.) When the President of Public arrived after 2:00 a. m., October 12, 1966, general counsel for the FDIC formally advised him of the proceedings and that Public had been closed and possession taken over by the FDIC as receiver. Public was in fact closed simultaneously upon the Court's action of appointing FDIC as receiver. He was also advised of the sale to Commonwealth. Various employees of FDIC, the State, Public and Commonwealth immediately began preparing the necessary arrangements for an opening on Wednesday morning for the continuation of the going business. The receiver's sale agreement was executed in the offices of the Commonwealth at about 2:00 a. m. by Commonwealth representatives. Almost a half an hour later the general counsel for FDIC executed the receiver's sale agreement in behalf of FDIC.

133.) Within three days following October 12th a copy of the Court's order of October 12th approving the receiver's sale agreement and setting November 2nd as the date for hearing of any objections was mailed to all shareholders of Public in accordance with its provisions. The various court hearings then followed as has been set forth heretofore.

134.) No pre-trial hearing as such has been held in this matter. Several hearings were conducted by the Court setting forth "ground rules" to be followed at the show cause hearing. Requests for discovery were made at that time. No pre-trial conference was requested. This question was first raised partially through the show cause hearing. The Court numerous times specifically stated it would permit any adjournment necessary to obtain discovery information or to review evidence received. This Court permitted all discovery sought within the rules of evidence. No adjournment for such purpose was requested.

The foregoing reflects the conviction of this Court that all the pertinent facts relating to this matter should be determined. This Court appreciates that the findings are only based on evidence presented at this hearing. Some persons represented herein chose not to affirmatively present evidence. Such persons may desire to do so at a later date relating to pending future shareholder, derivative, or other actions. It is possible that such may cause some different specific fact findings relating to these other suits. However, all persons are bound for purposes of this hearing to the findings and conclusions of this Court relating to the issues and determinations herein.

Throughout the hearing respondents took varying positions with relation to the issues presented to the Court. Some respondents eventually concurred with the petitioner. Some respondents raised several issues, while concurring with the remainder. Some respondents tested every issue. Now, based on the foregoing factual findings, the listed issues will be determined.

## CONCLUSIONS

### ISSUE NO. I

The first issue questioned whether the original assignment of this cause was violative of General Court Rule 925.5(1) and its effect.

Rule 925.5(1) states as follows:

"Each civil action shall be assigned to one of the judges of the circuit at the time of its commencement. Such assignment shall be made by lot and in such manner as to result, as nearly as possible, in each judge of the circuit receiving an equal number of actions from each of the following classifications: automobile negligence, domestic relations and other general civil."

It is clear that this subject cause was initially assigned to Judge Burdick prior to its commencement. It is also clear, however, that such assignment was made impartially, in good faith, and by lot under the direction of the Presiding Judge and Presiding Judge Pro Tem of the Wayne County Circuit Court.

General Court Rule 13 states:

"The aims of the committee in drafting these rules included this statement: 'de-emphasize procedural niceties so that cases can more readily be disposed of on their merits.' In order to have this take place, these rules must be construed in every instance insofar as possible in accordance with the direction given by this rule.

"Rules of practice and procedure are exactly that. They should create no rights and should be thought of as indicating the way in which justice should be administered. They should give direction to the process of administering justice but their application should not become a fetish to the extent that justice in an individual case is not done. There is a need for guides and standards. They must be followed but they must always be thought of as guides and standards to the means of achieving justice, not the end of justice itself."

General Court Rule 529.1 states:

"Harmless Error. No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a ver-

dict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding shall construe these rules to secure the just, speedy, and inexpensive determination of every action so as to avoid the consequences of any error or defect in the proceeding which does not affect the substantial rights of the parties."

The foregoing reflects the distinction long recognized in Michigan that Court Rules are directory and not mandatory unless a failure to follow is expressly declared to be fatal or such effects an essential element of the action and is prejudicial. Goodspeed v. Smith, 161 Mich. 688, 126 N.W. 975; Attorney General ex rel. Miller v. Miller, 266 Mich. 127, 253 N.W. 241, 106 A.L.R. 387. In Alpena National Bank v. Hoey, 281 Mich. 307, at page 311, 274 N.W. 803, at page 805, the Court stated:

"The business of the courts is too important to the people of the state to permit formal details of the machinery of the designation of judges to control their jurisdiction." See also People v. Davis, 357 Ill. 396, 192 N.E. 210.

The reason for the Court Rule is apparent. Its purpose should be fully complied with. The instant case was unusual in that in a matter deeply effecting the financial stability of this community, prior time arrangements with the Court were essential to help provide the opportunity for a court hearing without premature publicity. No evidence was presented which reflected that merits were discussed between the Petitioner and the selected Judge prior to the commencement of the action. In this respect there must not be any preferred litigant and such did not occur in this case.

It is the opinion of this Court that substantial compliance with the Rule was followed in this case. The Judge was selected by lot; the Judge was selected prior to the commencement of the action but such was necessary for time arrangements and did not prevent all parties from having a fair and impartial hearing. No prejudice was shown. In short, the selection of the Judge prior to the commencement of the action was not inconsistent with substantial justice. The action of the Court should not be considered void for such cause.

## ISSUE NO. II

The second issue is similar in that it questions whether the terms of the Wayne County Court Rule 1.2 were followed and their effect.

Wayne County Court Rule 1.2 entitled "Sessions of Court" states as follows:

"There shall be five (5) full day sessions of court each week, Monday through Friday (Holidays excepted).

"The hours of court shall be from 9:30 A.M. to 12:30 P.M. and 2:00 P.M. to 4:30 P.M., except as otherwise ordered by the Court."

This Court Rule sets forth certain hours, "except as otherwise ordered by the Court". Such language clearly permits a judge within his reasonable discretion, to hold court at other times other than the minimum hours specified.

No prejudice was shown with respect to the hours that the Court set to hear the case. It is clear that night sessions may be held after normal adjournment time within the reasonable discretion of the trial judge. People v. Robinson, (1924) 228 Mich. 64, 199 N.W. 622; Fotopak Corp v. Merlin, Inc., 34 N.J. Super. 343, 112 A.2d 578.

The fact that the case was started after hours also was unusual but not unlawful. No prejudice was shown by the after hour filing which also helped assure there would be no publicity or run on the bank prior to the Court's determination. On the contrary, a run precipitated by wild rumor would have further depreciated the interests of stockholders.

It has been suggested that proceedings under Circuit Court Rule 22 permitting

suppression of pleadings would have offered ample secrecy to avoid the undesired publicity. Rule 22 provides as follows:

"Rule 22—Suppressed actions

"Rule 22.1 Orders of Suppression

"Any party or his attorney may move the judge in writing to suppress the pleadings filed in any action that has been assigned to him, for good cause shown.

"Rule 22.2 Access to File

"No person, except the parties to the action, their attorneys, or a judge of this court, shall examine any papers so suppressed until such action or some phase thereof shall be heard in open court. When an order of suppression is entered the Clerk of the Court shall secure all papers filed in such action and shall deny all unauthorized persons access thereto, except as herein provided.

"Rule 22.3 Publication

"No person shall publish or cause to be published any portion of the aforementioned suppressed papers unless the action or some phase thereof has been heard in open court.

"Violation of this rule shall constitute a contempt of court."

In this case immediately upon the filing of the cause, the Petitioner promptly requested that its petition be granted. Such action was heard in open court. By the Rules' own terms any suppression would then terminate. Furthermore, the effect of this rule is not clear. It could stop the publishing of the "papers" (unless the same information is obtained elsewhere) but it is doubtful that such suppression would cover the publishing of the fact of the filing of the action itself. If an order were issued and violated in a case such as this, contempt action under the rule would be ineffectual and too late

Accordingly, it is the Court's opinion that Rule 22 of the Wayne County Circuit Court Rules permitting orders of suppression for good cause shown was

no alternative to the Petitioner and would not have achieved the desired end that notoriety be not attendant to the filing of the action. The night session was unusual but not unlawful nor prejudicial. It was necessary to give the opportunity of court consideration without premature publicity.

### ISSUE NO. III

The next issue, similar to the last, raises the question whether the hearing of October 11 and 12, 1966, was held in "public" as required by M.S.A. 27A.1420.

The above mentioned statute states as follows:

"The sittings of every court within this state shall be public except that a court may, for good cause shown, exclude from the courtroom "other witnesses in the case when they are not testifying and may, in actions involving scandal or immorality, exclude all minors from the courtroom unless the minor is a party or witness. This section shall not apply to cases involving national security."

"Open Court" is defined in 2 Bouv. Law Dict., Rawle's Third Revision at p. 2414 as:

"A court formally opened and engaged in the transaction of all judicial functions. A court to which all persons have free access as spectators while they conduct themselves in an orderly manner. The term is used in the first sense as distinguishing a court from a judge sitting in chambers or informally for transaction of such matters as may be thus transacted."

It is the finding of this Court that the above hearings were public. The courtroom door was open. Two courthouse doors were open to anyone desiring to enter Judge Burdick's court. The hearing was conducted in open court and not in chambers. The court reporter and clerk were present. No evidence reflected anyone desiring to attend was rejected. Although it is recognized that the general public would not expect the

Circuit Court to be holding evening sessions, the fact the hearing was conducted during an after hour night session does not render the hearing any less "public". It is recognized that it would be most unusual if an uninterested third party would wander into the courtroom during the late hour session held on the subject date.

It is to be noted under M.S.A. 27A.-2926, Comp.Laws Mich. 1948, § 600.2926 [Pub.Acts 1961, No. 236], a Circuit Judge may appoint a receiver "in vacation, in chambers, and during sessions of the court". Although such was not the case here, a receiver could be validly appointed without it being done in "open court" in view of the specific statutory authorization. In conclusion therefore, although the hearing was conducted at an unusual evening session, nonetheless the hearing was open to the public and accordingly appropriate.

## ISSUE NO. IV

It has been the purpose of this Court during the course of the hearing commencing April 6, 1967, to listen to any and all factual evidence tested by cross examination, embellished by exhibits and expounded by legal argument which any person presented who considered himself aggrieved by the Court orders of October 12th, and then to make the numerous determinations in a single opinion to avoid a multiplicity of separate hearings and appeals.

During the course of the hearing some persons who considered themselves aggrieved by the Court's orders of October 12th through able counsel, objected to this Court entertaining any further testimony except certain witnesses tendered by them pertaining to procedural issues only. It is the contention of these protestors (directors and some stockholders) that the only testimony this Court can consider, with the above exception, would be that offered upon the evening of October 11th and the morning of October 12th.

Other protestors of like category (some fewer stockholders) insisted upon searching for all the facts that lead up to the culmination of the Court's orders. Much of the testimony and exhibits originated from such protestors' searching inquiry. During the hearing this Court took under advisement the above objections of respondents and permitted the fullest participation of all protestors including these specific respondents who did fully participate.

This Court has sole jurisdiction over the receivership and may terminate it at any time. Singer v. Goff, 334 Mich. 163, 54 N.W.2d 290; Brandimore v. Dickens, 256 Mich. 128, 239 N.W. 346. As this Court has continuous jurisdiction and authority over the receivership, it was this Court's decision to listen to all parties in order to determine whether the receivership should be continued, altered, terminated or replaced. It is the considered opinion of the Court that by having placed before the bar all relevant facts and all reasons for objection, the fairest and most just determination should result. To concur with an effort to put blinders on the Court, to consent at this stage to only view certain limited facts and to be bound to entertain only certain procedural issues, would create a stifled obtuse reflection and not substantial justice.

The burden of proof rests upon the Petitioner. An ex parte hearing was held on October 11th and 12th during which some limited evidence was presented. Such was sufficient to cause the Court to enter its orders now contested. The Court's order contemplated a further hearing at which time all issues could be tried under adversary proceedings. It would be unjust to some respondents who desire to find out about all the facts, to be limited to the technical positions of other protestors. Likewise, it would be unjust to permit full license to respondents but restrain the petitioner, who carries the burden, from further asserting his position. This Court is not convinced that the best course is the proposed avenue that sheds the least amount of light.

A trial judge has within his discretion to reopen a case and take further proofs under attending circumstances. Westgate v. Westgate, 291 Mich. 18, 288 N.W. 860; Deyo v. Detroit Creamery Co., 257 Mich. 77, 241 N.W. 244. This hearing was not a reopening but an essential opportunity for any person who felt themself aggrieved by the Court's action to be heard. With all the facts at hand this Court is in a sounder position to determine whether the actions taken ex parte on October 11th and 12th, were proper and justified or whether due process was obliterated or whether the bank was not insolvent or the action taken was not expedient.

The matter of this receivership is one of great interest to the public as well as to financial circles. A full inquiry was appropriate in the public interest. The depositors, all the stockholders, the creditors and the community are entitled to a full consideration of factual and legal issues. Such should not be stunted by the desires of directors and some stockholders of Public Bank.

Finally, if any appeal is sought, the Appellate Court should have the benefit of the background of all pertinent factors that led up to the Court's initial action.

## ISSUE NO. V

The next issue raises the question of due process. It is clear that on the evening of October 11th and the morning of October 12th, 1966, no prior notice of the hearing was given to any official or representative or shareholder of Public Bank. During the course of such hearings no official or representative or shareholder of Public Bank was in attendance nor did the Court hear any testimony, evidence or argument during the course of such hearings from representatives of Public. In view of the lack of notice and the lack of opportunity to be present and heard, some respondents strongly assert that such constituted a wrongful deprivation of their property rights without due process of law.

The provisions of the 5th and 14th Amendments to the Constitution of the United States and the provisions of the Constitution of the State of Michigan relating to the taking of property without due process of law, do not require recitation.

The basis for the initial petition presented to the Court is found in Section 115 of the Michigan Financial Institutions Act, M.S.A. 23.868 which provides in part as follows:

"The following shall constitute grounds for the appointment of a receiver (as hereinafter provided) for any bank subject to the provisions of this act:

\*    \*    \*    \*    \*    \*

2. Whenever any bank shall become insolvent.

\*    \*    \*    \*    \*    \*

"Upon being satisfied that all or any of the grounds for the appointment of a receiver set forth in this section exist and that the interests of the depositors and creditors of the bank and other parties in interest render such action expedient, the commission, with the attorney general representing it, shall apply to the circuit court of the county in which said bank is located for the appointment of a receiver of the bank. Upon presentation to it of such application and upon its being satisfied that all or any of the grounds for the appointment of a receiver set forth in this section exist and that the interest of the depositors and creditors of the bank and other parties in interest render such action expedient, the said court shall immediately appoint a receiver for the bank who shall proceed to close the bank \*    \*    \*."

These respondents assert that the Court should not have appointed the FDIC as receiver without notice and an opportunity to be heard and secondly, should not have approved the sale of the assets by the receiver to Commonwealth without prior notice and the opportunity for a hearing.

Procedural due process cannot be considered in the abstract but must be viewed with relation to the attendant circumstances. In the instant cause the Court was presented a petition dealing with alleged insolvency of a banking institution. Banks are unique institutions which sustain the life blood of our economic society. In 9 Zollman Bank and Bankings, Section 5722, it is stated:

"The safety of the banks and, in case of their insolvency, their liquidation in a proper manner is a matter of general public interest. The receipt of other people's money and the use of such money by banks for their own profit make regulation and supervision necessary. The various customers of banks must be protected.

"If a person or corporation engaged in mercantile pursuits fails, the injurious results are limited. Such failure does not tend to shake confidence in the business soundness of other similar enterprises. The situation is different with banks. The suspension of a bank in any locality causes depositors in other banks in the same locality to become suspicious of the solvency of the bank with which they are dealing. Withdrawals follow, and, if they are sufficiently numerous, a second bank may be forced to the wall. Every bank suspension shakes confidence in other banks. If a large and well-known bank fails the greater is the injury produced. It may bring on a financial panic of national extent, with its consequential ruin of and disaster to thousands and with its serious effect on the welfare and hapiness of the public generally for greater or lesser periods of time.

"Banking therefore is a business affected with a public interest, and therefore the Legislature may classify banks separately from other forms of business and commercial enterprises and specially regulate but not prohibit them."

Our statutes and our court decisions have long recognized the special character of banking. The confidence of the general public in a sound banking system is essential to the conduct of our highly technological and sensitive economic system. The average citizen must have faith and confidence in banking institutions or economic chaos would result like the haunting memories of the 1930's.

When a bank becomes in a distressed position, the primary consideration necessarily becomes that of the depositors and creditors. In Lansing Drop Forge Co. v. American State Savings Bank, 273 Mich. 124, 262 N.W. 756, 104 A.L.R. 1199, the Court stated:

"The bank was insolvent and its affairs, inclusive or rights of creditors, were in the hands of the court appointing the receiver. The statute was enacted as an aid to the court in administering the estate of the insolvent bank for the best interests of all depositors."

Furthermore, In Re First Central Trust Company, Akron, 13 Ohio.Supp. 40, 28 O.Op. 1, it was stated:

"We believe that the whole theory and purpose of constitutional and statutory provisions relating to liquidation of banks and assessment of superadded liabilities upon bank stockholders are primarily to protect the depositors and other creditors of the bank."

It is clear that banking is a special field where the law has made special provisions with respect to its operation and alleged insolvency. The innocent depositor who relies upon the seeming stability of a going bank appropriately draws first consideration from public policy as contrasted to stockholders and directors whose primary interest is a return on investment and who may be privy to special advantages and inside knowledge.

Thus, the rights of a bank and its stockholders are subject to superior rights of depositors, creditors and the public welfare. Stockholders rights, in particular, are limited by the very statutory authority that grants them license to participate as a banking institution. In Bank Commissioner's v. Bank of

Brest, Harr. Ch., at P. 106 (1839), the Michigan Supreme Court stated:

"Banks, statutory provisions for winding up are for public security. The statute prescribes the mode in which the affairs of banking associations, established under the general banking law of this state, shall be wound up, in case of insolvency; and this forms a part of the security to the public and is one of the conditions upon which they take their chartered powers."

In Michigan, the Michigan Financial Institutions Act (MFIA) governs the operations of state banks. Section 115 of the MFIA, cited above, reflects the bases upon which a receiver may be appointed by the Circuit Court. Such sections state that: "Upon presentment to it of such application" * * * the Court being satisfied with any of the grounds for the appointment of the receiver * * * "shall immediately appoint a receiver for the bank" * * *. This statute for the above reasons is framed in terms of summary action and does not require notice to the bank or its shareholders. It further anticipates that an appointment of a receiver must be done "immediately". Since the statute specifically makes no requirement of notice, such becomes a question of reasonable discretion.

The Judicature Act under Section M.S.A. 27A.2926, provides as follows:

"Circuit court judges in the exercise of their equitable powers, may appoint receivers in all cases pending where appointment is allowed by law. This authority may be exercised in vacation, in chambers, and during sessions of the court."

In Tuller v. Wayne Circuit Judge, 243 Mich. 239, 219 N.W. 939, the Court held:

"The appointment of a receiver without notice is entirely a matter of judicial discretion, the power to make the appointment without is inherent in a court of equity. It follows logically that want of notice does not affect the validity of the appointment in reference to whether it is void, but merely concerns it as being the proper or improper exercise of sound judicial discretion." See also, Hochrein v. Gunther, 268 Mich. 682, 256 N.W. 594; Livingston v. Southern Surety Company of New York, 262 Mich. 438, 247 N.W. 712.

In 75 C.J.S.Receivers § 49, at P. 705, it is stated:

"In most jurisdictions the courts have power to appoint a receiver without notice to defendant, and the matter rests in the sound discretion of the court, in the exercise of which it must necessarily be governed by the situation as it presented and appears to the court at the time of making the order * * *."

This Court had the inherent power to appoint a receiver of Public Bank without notice as long as such is within reasonable discretion under the attending fact circumstances.

For purposes of comparison, under Federal Law, a comptroller has power to summarily appoint a receiver for an alleged insolvent national bank and to make assessment on shareholders without previous judicial ascertainment of the necessity of such action. 12 U.S.C.A. § 191; Bushnell v. Leland, 164 U.S. 684, 17 S.Ct. 209, 41 L.Ed. 598. The determination of insolvent is a matter of judgment and discretion in the hands of the comptroller.

Under Section 129 of the MFIA (M.S. A. 23.882), Comp.Laws Mich.1948, § 487.129, the Commissioner may appoint a conservator for a bank without any prior notice or hearing when any of the grounds set forth in Section 115 of the Act exist. Section 130 of the Michigan Financial Institutions Act, Comp.Laws Mich.1948, § 487.130, provides that the conservator shall have all the rights, powers and privileges given receivers of banks appointed pursuant to the Act. It is clear that the Commissioner may appoint such conservator without prior notice or hearing of any kind and that such practice has been universally held to be appropriate. Title Guarantee and Surety Company v. State of Idaho, 240

U.S. 136, 36 S.Ct. 345, 60 L.Ed. 566. Under Section 21 of the MFIA, Comp. Laws Mich.1948, § 487.21, any interested party may petition circuit court to show cause why such order or action of the Commissioner should not be set aside.

The foregoing follows very similar the course of this cause. Whether a receiver is appointed by judicial action or a conservator is appointed administratively by the Commissioner, such may require an immediate course of action without any delay in order to protect the interest of all parties. The fact that the instant action was taken through the route of a court appointed receiver does not strip from the court, under attendant necessary circumstances, the power to appoint a receiver without notice or a hearing. The fact that without question an administrative determination may be made without prior notice and hearing, places greater statutory authenticity upon a court, aside from its inherent equity power, to act within its discretion under similar circumstances when dealing with a banking institution.

With respect to the failure to give notice and provide a prior hearing regarding the petition of the receiver to sell the assets of Public to Commonwealth, Section 126 of the Michigan Financial Institutions Act vests in the receiver upon accepting appointment, both possession and title to all assets.

Under Section 125 (M.S.A. 23.878) the FDIC as receiver:

" * * * shall have and possess all the powers and privileges provided by the laws of this state with respect to a receiver of a banking institution and be subject to all the duties of such receiver, except insofar as such powers, privileges or duties are in conflict with the provisions of 'the banking act of 1933.' "

Similarly, as Section 115 of the MFIA makes no mention of prior notice or hearing, Section 116 of the Act, Comp. Laws Mich.1948, § 487.116, describes the powers and duties of the receiver as follows:

"The receiver, under the direction of the commission, shall take possession of the books, records, and assets of every description of such bank, collect all debts, dues, and claims belonging to it, and, upon the order of a court or competent jurisdiction may sell or compound any or all bad or doubtful debts, and, on a like order, may sell any or all the real and personal property of such bank, on such terms as the court shall direct; * * *."

It is noted that the statute gives the receiver the power to sell any or all of the real and personal property of the bank upon the order of a court. Prior notice and hearing is not a statutory pre-requisite.

In 75 C.J.S. Receivers § 226 it states: " * * * a sale may be upheld without notice where it appears that the property was sold for a fair price and no injury resulted from lack of notice and the circumstances were such that it was necessary that the sale be made without delay and without notice."

For comparative purposes, under the provisions of the National Banking Act the receiver's powers are almost identical to the MFIA. Such National Banking Act provides as follows: (12 U.S.C.A. § 192)

"Such receiver, under the direction of the comptroller, shall take possession of the books, records, and assets of every description of such association, collect all debts, dues, and claims belonging to it, and upon the order of a court of record of competent jurisdiction, may sell or compound all bad or doubtful debts, and, on a like order, may sell all the real and personal property of such association, on such terms as the court shall direct."

In Dugger v. Cox, 110 F.2d 834, the Court of Appeals for the Sixth Circuit interpreting the above mentioned provisions, stated:

"The application to the Court for an order for the sale of assets is a step in the winding up of the affairs of a bank and if such an order be granted,

although made by a Court of record of competent jurisdiction, still the funds realized by the sale are not subject to disbursements by the Court, but by the Comptroller, whose agent is in the receiver of the bank. The proceeding in Court for the approval of a sale is ex parte.

"The Statute does not contemplate notice to those interested and there are none of the essentials of a controversy, the proceedings lacking judicial characteristics."

In view of the great similarity between the statutory provisions of the National Banking Act and the MFIA in describing the powers and duties of a receiver, it logically follows that a similar interpretation should be placed. Reasoning does not suggest that a state banking institution should be handled differently than a national banking institution particularly when the provisions of the state and federal acts are greatly similar. The ultimate impression upon the community would be parallel.

This "doctrine of necessity" is recognized by many jurisdictions. In particular in State ex rel. Connors v. Shelton, 238 Mo. 281, 142 S.W. 417, the Supreme Court of Missouri held:

"One of the inherent powers of a court of equity is to act with good sense. If the * * * property is perishable and deteriorating, and if there are no corporate means at hand for conserving it, and the interests of the creditors and stockholders are best served by a sale, what good reason can be given why the chancellor who holds the property of an insolvent corporation through his receiver may not sell it? Why hold it until it becomes worthless? * * *. Order of sale under such circumstances is not an unusual incident of a receivership." 238 Mo. at 295, 142 S.W. at 421.

Accordingly, it is recognized under circumstances of necessity a sale by a receiver of assets placed in the hands of such receiver, may be made without prior notice and a full hearing within the discretion of a court acting with good sense. This Court possessed the inherent power to approve the petition of its receiver, who held title and possession, to sell certain of the assets of Public to Commonwealth, without a prior notice and full hearing as long as such would be within reasonable discretion.

Since this Court is now requested to alter or terminate the receivership due to alleged lack of due process, it must weigh the prompt actions of the Court made under the attendant circumstances now fully exposed by voluminous testimony. If this Court were to conclude that prior notice and hearing were necessary, to whom should the notice be addressed and to what extent would a prior hearing be sufficient? Would all the shareholders need be notified of the petition prior to its being presented to the Court? If this were the case it obviously would have been impossible under time limitations. Would notice to the directors or President or officers of the corporation be sufficient? This may have been possible after banking hours but it could be asserted that these parties already knew of Agreement B and the procedures outlined therein and had already substantially approved a very similar sale agreement to Commonwealth. On the other hand, upon being advised of the merits and basis of the Commissioner's petition, during very precarious hours, the Court appropriately recognized that any destructive action during such period where time was of the essence could have resulted in a short but fatal hiatus obliterating the pre-requisite of continued operation.

Under the receiver's sale, a continuation uninterrupted of the banking operation was an essential pre-requisite. Such pre-requisite was not only imperative to Commonwealth but also was key to the purpose of FDIC and the Commissioner to maintain community confidence, to obviate a run and to protect depositors. The moments were fraught with danger. On October 11th the condition of Public Bank was extreme distress. Immediate

action was required in the public interest. The situation then was not such as could "afford the luxuries of of litigation and long delays which preliminary hearings traditionally have entailed." Bowles v. Willingham, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892. It was essential that a court hearing be conducted without attendant publicity and the extreme risk of precipitating a hiatus which would have commenced a run and destroyed the very end which was in fact secured, i. e. an exhaustive opportunity to raise objections, full protection of depositors, a continuation of the banking operation, an orderly handling of Public's affairs as a going concern and a transfer under the best deal available.

What then logically would give all parties an opportunity to fully participate and ample notice to prepare than the defeasance provision in the Court's order of sale on October 12, 1966?

In 16 Am.Jur.2d, Constitution Laws, Section 576, it is stated:

"Due process of law is afforded litigants if they have an opportunity to be heard at any time before final judgment is entered. The exact time is not, so far as due process is concerned, a material consideration. It has been said that the hearing or opportunity to be heard must be prior to judgment. But the view has also been taken that due process does not require an opportunity to present defenses before the entry of judgment; that it is sufficient if an appeal is provided or another method of review available. * * * "

By providing for a hearing at which time all objections could be fully aired, the Court has provided the respondents ample opportunity to appear and be heard. Due process has been afforded all parties by such subsequent hearing. A full gauntlet of issues have been presented to this Court to pass upon. Voluminous testimony was taken and fine arguments presented challenging and testing the action of the Court of October 11–12. If the evidence presented fails to meet the Petitioner's burden of proof and gives no ample cause for altering, changing, modifying or voiding the actions taken by the Court on October 12th, the fact that some few parties did not receive notice of such action and were not afforded the opportunity to be heard during a period of several hours, does not reflect that due process was cast aside the evening of October 11–12. On the other hand, if the preponderance of the evidence reflects that the petitioner has not met the burden of proof in showing that Public was insolvent on the subject date and that such action taken by the Court was expedient and that such action was reasonable and the sale was appropriate and fair, this Court would and could grant remedial action.

In the last analysis, on the one hand are weighed the great traditions of appropriate notice and appropriate opportunity to be heard at a meaningful time and in a meaningful manner, (Armstrong v. Manzo, 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62) and on the other hand, an extreme emergency involving the possible insolvency of the largest bank in the United States since the bank failures of 1933 in the same city where the bank holiday commenced when the interests of depositors and creditors are paramount. Under such circumstance, upon consideration of all factual and legal objections, it is concluded the Court used its discretionary authority within reason and with good sense. The public interest, directed to maintain fiscal stability and to protect depositors, should prevail over the limited interests of bank stockholders and directors. The respondents were not deprived of their property without due process of law.

ISSUE NO. VI

The next issue is whether Public Bank was insolvent.

Section 115 of the MFIA gives eight separate and alternative grounds for the appointment of a receiver including the following two:

"The following shall constitute grounds for the appointment of a receiver (as

hereinafter provided) for any bank subject to the provisions of this act:

* * * * * *

"2. Whenever any bank shall become insolvent.

* * * * * *

"4. Whenever a bank has refused to pay its deposits or obligations in accordance with the terms under which such deposits or obligations were incurred. * * *"

There are two basic tests often commonly employed to determine the existence of "insolvency". The "balance sheet" or "bankruptcy" test provides that "insolvency" exists when the liabilities of a bank exceed the fair market value of the assets. The second test is the "chancery test", when a bank is unable to meet the demands of its depositors in the ordinary course of its business. Under such circumstance it is then considered "insolvent."

The MFIA became law in 1937. Its immediate predecessor was the General Banking Code of 1929 being Act 66 of the Public Acts of 1929. Section 62 of this Act was similar in form to Section 115 of the present MFIA. Section 62, (C.L.1929, Sec. 11959) included the following as grounds for appointment of a receiver.

"If the commissioner (of the banking department) shall become satisfied that the capital of any bank has become impaired * * * or if the commissioner shall have become satisfied that any bank has refused to pay its deposits and/or obligations in accordance with the terms on which such deposits and/or obligations were incurred, if received in accordance with the provisions of this act * * *."

It is noted that the foregoing language relating to refusal to pay deposits or obligations is virtually identical with Ground 4 of the present Section 115. The prior Act, however, did not contain the second provision in Section 115, "insolvency", as one of the grounds for the appointment of a receiver.

At a time prior to the enactment of MFIA, the common law chancery test was reflected by the Michigan Supreme Court in Greene v. Ancient Order of Gleaners, (1934), 267 Mich. 488, 255 N.W. 303, as:

"Practically all authorities define 'insolvency,' in its legal sense, as existing whenever a bank, from any cause, is unable to pay its obligations in the ordinary or usual course of the business. * * * The above definition excludes extraordinary demands, induced by panic and commonly evidenced by a run on the bank, but includes all demands to be anticipated in the ordinary conduct of banking."

This chancery test was thereafter approved in Daugherty v. Park, 274 Mich. 673, 265 N.W. 499 (1936), and in Commissioner of Insurance v. American Life Insurance Co., 290 Mich. 33, 287 N.W. 368 (1939). In the latter case, however, the Court was dealing with a matter involving the Insurance Commission and an insurance company. As dicta, the Court quoted the *Greene* case as the test of insolvency then applied to banks but did not give cognizance to or analyze the Greene case vis-a-vis the subsequently adopted MFIA.

An older Act, being the Act of June 21, 1837, 3 Compiled Laws, 1929, Section 15334, stated as follows:

"Injunction against insolvent banking or insurance corporation; restraint of rights. Whenever any corporation having banking powers * * * shall become insolvent or unable to pay its debts, or shall neglect or refuse to pay its notes or evidence of debt on demand, or shall have violated any of the provisions of its act or acts of incorporation * * *."

This Act did specify "insolvency" together with inability to pay debts on demand in similar context to the present Section 115. It is urged by respondents that inferentially, based on this 1837 law, the term "insolvency" was implicit in the Banking Code of 1929 and accordingly the reasoning of the Greene

case would be incorporated in Ground 2 of Section 115 of the MFIA.

However, in Stewart v. Algonac Savings Bank, 263 Mich. 272, 248 N.W. 619, the Michigan Supreme Court held that the 1929 Banking Code by implication had preempted the banking field and superceded former laws on the subject. It is clear then under the 1929 Code that the term "insolvency" was not a separate ground for consideration when viewing bases for appointing receivers of financial institutions to be differentiated from the ground or refusing to pay obligations in accordance with their terms under which they were incurred. Accordingly, during the period that the general Banking Act of 1929 was effective prior to the enactment of the MFIA, the term "insolvency" was not implied in the Act as a separate and distinct ground from refusing to pay obligations.

Since the enactment of MFIA, it is clear that Ground 4 of Section 115 of this Act is far more stringent than the common law chancery test set forth in *Greene*. The common law chancery test covered the failure to meet obligation to depositors in the regular course of business excluding extraordinary demand induced by panic or run on the bank. Ground 4 contains no such exclusions specifically stating "whenever a bank has refused to pay its deposits * * *". For practical purposes, the chancery test in *Greene* is statutorily superceded by Ground 4 of Section 115.

A review of Section 115 clearly reflects and alleges by its intent that Ground 2 does not have exactly the same meaning in effect as Ground 4. Such a construction would deny Ground 2 any force and effect and make it meaningless. On the contrary, it is the opinion of this Court that the 1937 Legislature by adding Ground 2 while retaining Ground 4, intended to have each fundamental test of insolvency a separate basis for the appointment of a receiver.

Likewise, the addition of Ground 2, "insolvency", was not intended to legis-late the common law chancery test since even a more stringent similar ground was clearly set forth and stated as Ground 4. It would be meaningless.

Conceivably a bank even if solvent under the bankruptcy or balance sheet test still could be insolvent under the chancery test because it has refused the demands of its depositors in the regular course of its business. Likewise, as in the instant case, a bank could be considered solvent under the chancery test having not yet refused the demands of its depositors yet insolvent when the liabilities of the bank exceed the fair market value of the assets.

It is the opinion of this Court that the legislature in 1937 with a recent background of bank failures, intended to give to the Banking Commissioner a broad basis in which he could deal with an alleged insolvent bank. It enumerated eight grounds, any one of which may be a basis for the appointment of a receiver. Ground 3 of Section 115 reflects that an impairment of capital not restored within two months is a ground for the appointment of a receiver. (see also Section 55 of MFIA) Impairment of necessity must be determined under a balance sheet test. If impairment is a ground for appointment of a receiver if not cured within two months, it is reasonable and compelling to conclude that the Legislature intended a total extinguishment of all capital should be a ground for the immediate appointment of a receiver.

Thus, Section 115 of the MFIA provided the Banking Commissioner two alternative grounds to establish "insolvency". Instead of just being limited to a time when a bank has refused to pay its deposits or obligation in accordance with the terms under which deposits were incurred, grounds for appointment of a receiver also are established whenever a bank has liabilities that exceed the fair market value of its assets.

Under such test it is the opinion of this Court that Public Bank was in-

solvent on October 11, 1966. Based on a balance sheet test, the liabilities of Public exceeded assets by $1,347,084.36. Subsequent testimony reflected that the liabilities exceeded the assets by $1,362,-779.20 based on corrected market evaluations. In arriving at the deficit, U. S. Government Bonds, Municipal Securities and FHA Real Estate Mortgages of the bank were priced at market.

In addition to the insolvency format which only reflected the deduction in valuation of the securities portfolio, it was concluded by the FDIC examiner, at least $2.5 million should be deducted from the capital account to more accurately reveal installment loan losses as of October 11th. Also, fixed assets on the bank's books were overstated by $500,000.00 included among other downward adjustments. Irrespective of these additional considerations, it was the opinion of the State Banking Examiner and the FDIC Examiner that Public was insolvent on October 11th.

Proof of current market quotations for bonds listed as assets is competent evidence on the question of the actual value of such bonds. Schroeder v. State, 210 Wis. 366, 244 N.W. 599, 250 N.W. 185, 87 A.L.R. 496. The establishment of market value of property by reference to newspaper quotations showing the relevant market valuations has been approved by the Michigan Supreme Court. Peter v. Thickstun, 51 Mich. 589, 17 N.W. 68; Jordan v. Miller, 232 Mich. 8, 204 N.W. 708. The opinion testimony of banking experts as to insolvency was appropriately considered by this Court. It is stated in 10 Am.Jur.2d, Banks, Section 266 at p. 237:

"Generally expert and opinion evidence is admissible as to the solvency or insolvency of a bank, as that question bears upon a prosecution of a bank officer for receiving deposits with knowledge of the insolvency of such bank. A licensed public accountant is qualified to testify as an expert as to the insolvency of a bank. Likewise, the opinion of a bank examiner as to the bank's insolvency, based on an examination of the books and assets of the bank and on information obtained by him in regard thereto, is admissible. Generally, opinion evidence is admissible on the question of the value of property and is ordinarily admissible for that purpose in a prosecution for receiving deposits with knowledge of the bank's insolvency."

It is appropriate to have considered the market value of the U. S. Bonds, Municipal Securities and FHA Real Estate Mortgages at their market value. On October 11th Public Bank was in great distress. It could no longer earn its way out of its difficulties. Its collapse was imminent. Although on its books Public carried its securities at cost rather than the current market value which is appropriate, such was not relevant on October 11, 1966 for Public Bank. The question then posed was whether Public's assets were of sufficient market value at that time to meet its obligations to depositors. The only appropriate way to evaluate such assets under this test is to determine the value of these securities at market value. Public at that time could no longer afford the luxury of holding its portfolio to maturity to collect the full amount of the obligations.

No appraisal of the market value of the real property held by Public through its solely owned subsidiary was secured. However, Public's President stated that such lands were overpriced on the books of Public by $500,000.00. Furthermore, approximately 10 months before, the Minutes of the Board of Directors of Public reflected that some of its properties were valuated on the books in accordance with their true market value. This Court accordingly concludes that the value of the real estate was certainly no greater than that reflected on the books. Furthermore, no affirmative evidence was presented to this Court for it to draw a conclusion that real estate values were greater or that the market value of any other asset was greater than

that reflected on the books and records of Public Bank.

In conclusion, Public Bank was insolvent on October 11th within the meaning of Section 115 of the Michigan Financial Institutions Act.

### ISSUE NO. VII

The next question presented to the Court relates to whether at the time of the appointment of the receiver on October 12th, was such designation "expedient" in accordance with the Michigan Financial Institutions Act.

"Expedient" is defined in Webster's New International Dictionary, 2d ed, as meaning: "whatever is apt and suitable to the end in view".

An Ohio Court in Werner v. Biederman, 64 Ohio.App. 423, 28 N.E.2d 957, defined "expedient" as: "A word of large import * * * [and] it comprehends whatever is suitable and appropriate in reason for the accomplishment of the specified object".

Under Section 115 upon the determination that a statutory ground for the appointment of a receiver is present, the Court must then become "satisfied * * * that the interest of the depositors and creditors of the bank and other parties in interest render such action expedient * * *."

This Court concludes that on the evening of October 11, 1966, it was not only "expedient" but necessary that a receiver be appointed for Public Bank for reasons including the following:

1. The fact that Public Bank was then insolvent.

2. The fact that the September 20th report of condition of Public, although then unpublished, was to be momentarily released reflecting a disastrous reduction in the capital account of the bank.

3. The fact that an 8(a) citation was issued nearly three months before by the FDIC reflecting findings of unsafe and unsound practices which citation was not yet released to shareholders or the general public but was to be revealed in several days.

4. The fact that an assessment letter of the Michigan Banking Commissioner demanded an assessment of $12.44 per share of stock to cure a capital impairment of over $5,700.000.00, which letter was not yet revealed yet to shareholders but was to be revealed in several days.

5. The fact that successive attempts by Public to obtain additional capital ended in failure.

6. The fact that successive attempts to effectuate mergers with stronger Detroit banks were unsuccessful.

7. The fact that there was no other known purchaser of substance than Commonwealth which purchase agreement was to expire on October 14th.

8. The fact that Public was experiencing great difficulty in completing a proxy statement required by Federal Law and in accordance with the terms of the purchase agreement with Commonwealth.

9. The fact that the accountants, who Public relied upon to assist them in preparing the proxy statement disassociated themselves from the project due to a difference of opinion with Public's management over the handling of reserve for loss of loan accounts.

10. The fact that it became impossible to hold a shareholders meeting of Public to approve the proposed sale of Public to Commonwealth in view of the time limitations of the sale agreement and the inability of Public to prepare a satisfactory proxy statement.

11. The fact that there was a continued worsening of the liquidity position of Public.

12. The fact that there was a continuing daily operating loss being suffered by Public further impairing capital funds.

13. The fact that there is a continued severe downward trend of deposits by customers of Public.

14. The fact that it was necessary for Public in order to meet its clearings, effectuated extraordinary daily borrowings from the Federal Reserve System which sum as of October 11th amounted to $9,500.00. Very little security remained in Public's portfolio for further borrowings from the Federal Reserve.

15. The fact that there were uninsured depositors in the amount of $10,000,000.00 then relying upon the stability of Public.

16. The fact there was the imminency of failure that lurked over the bank on every new day, acknowledge of Public's President, McGuire, by his statement in August 1966, "that it was doubtful if the bank could last one week".

In addition to these facts, several other points clearly reflect that the immediate sale by the receiver in accordance with the terms of the FDIC-Commonwealth Agreement B was clearly justified. Such additional circumstances were:

1. If an immediate sale was not effectuated, the standby Agreement B was in jeopardy since a continued operation was essential to Commonwealth as well as the FDIC.

2. That a prompt sale would effectuate a conservation of the going value of Public's assets actively handled by a vital purchaser as against the losses customarily incident to liquidation of a closed bank.

3. That an uninterrupted operation maintained the stability and confidence in the banking community by the general public.

4. That an immediate sale protected all depositors and creditors.

Under the circumstances there is no question that the action by the Court appointing a receiver was expedient. Furthermore, the action of the Court by effectuating an immediate sale by the receiver to Commonwealh was necessary and in the public interest.

### ISSUE NO. VIII

The question was raised whether the appointment of the FDIC as receiver was authorized and appropriate under the Michigan Financial Institutions Act.

Section 115 provides:

" * * * the said Court shall immediately appoint a receiver for the bank who shall proceed to close the bank * * * the court may appoint as receiver 1 of the bank examiners of the commission or some other competent and disinterested person who shall have the recommendation of the commission * * *."

Section 125 of the MFIA (M.S.A. 23.878) provides as follows:

"The federal deposit insurance corporation created by section 8 of the 'banking act of 1933' is hereby empowered, when authorized by the commission, to act as receiver without bond for any banking institution, the deposits in which are to any extent insured by said corporation, and which shall have been closed.

"The commission may, in the event of such closing, tender to said corporation the appointment as receiver of such banking institution, and if the corporation accepts said appointment, the corporation as receiver, shall have and possess all the powers and privileges provided by the laws of this state with respect to a receiver of a banking institution and be subject to all the duties of such receiver, except insofar as such powers, privileges, or duties are in conflict with the provisions of 'the banking act of 1933.' "

Public Bank conducted its business on October 11, 1966 in the ordinary course

of its conduct for the entire working day. The instant proceedings were instituted after regular business hours. No formal order of closing was made prior to the initiation of the court proceedings. It is urged that under such circumstance when the bank has not been closed in accordance with Section 125 of the MFIA, the FDIC could not be appointed receiver as the bank was not previously closed.

However, under Section 115 of the Act, upon a finding of insolvency and expediency of a receivership, the Court is required " * * * [to] immediately appoint a receiver for the bank who shall proceed to close the bank * * *."

Since the appointment of a receiver under Section 115 mandatorily requires that such receiver close the bank, the appointment is tantamount to the closing. Simultaneously upon presentment of a petition to the Court for the appointment of a receiver and upon the Court's approval of such appointment, the bank was closed. The act of appointing was the act of closing.

It is apparent that Section 115 clashes with respondent's proposed interpretation of Section 125 of the Act. A statutory construction must be made to avoid absurdity and to carry out underlying Legislative intent. It is this Court's opinion that Section 125 is not a limitation upon the authority of the Court under Section 115. The appointment of the FDIC was within the discretion and power vested in the Court under Section 115 of the MFIA.

Furthermore, a court of equity has inherent broad powers to appoint receivers which are not excluded by statutory provisions authorizing receivership. Grand Rapids Trust Company v. Carpenter, 229 Mich. 491, 201 N.W. 448. Such is also apparent under Section 601 of the revised Judicature Act, Comp.Laws Mich. 1948, § 600.601 [Pub.Acts 1961, Act 236].

In conclusion, the appointment of the Federal Deposit Insurance Corporation was authorized and appropriate.

## ISSUE NO. IX

This issue raises a question of whether the FDIC as receiver must be a "disinterested person" under the attendant facts.

It is the opinion of the Court that because of its unique position and due to clear statutory preference, the FDIC need not be a disinterested person and yet still hold the position of receiver.

The facts of this case repeatedly show the great interest and concern the FDIC had, first with respect to the success of Public Bank and then to support an effectual purchase plan which would be in the best interest of the general public. Such is the duty and responsibility of the FDIC. This agency was greatly concerned regarding the financial posture of Public which endangered the many depositors of Public, Public's creditors, the stability of the banking community, as well as the stockholders' equity. It insured to its statutory extent, the deposits of Public. It had concern over the $10 million worth of uninsured deposits. Its concern was reflected in the Agreements A and B wherein assistance in amount of a guarantee against losses up to $10 million was submitted if Commonwealth would purchase Public. Such interest was required and was proper and in no way diminishes the unique qualifications that this governmental agency possesses to act as receiver. Nor does such undermine its obligations as receivers.

Section 125 of the MFIA clearly singles out this state's recognition of the FDIC as a most appropriate receiver of a state chartered insured bank. Such recognition was statutorily extended irrespective of the known direct interests, powers and general duties in the bank regulatory field. Relating to any bank insolvency, it would be impossible to have the FDIC completely disinterested in view of its responsibilities. It was clearly contemplated in this specialized area that the general principals of a strictly disinterested receiver would not be applicable.

Under the Federal Statute (12 U.S.C.A. Sec. 1821) the FDIC must be the receiver of all closed national and District of Columbia banks and must accept appointment if tendered by State authority. The corporate powers of FDIC expressly include authority "to act as receiver". By reason of its powers, responsibilities and experience in the bank regulatory field, it is uniquely qualified to act as receiver.

## ISSUE NO. X

Was the sale contract between the receiver and Commonwealth negotiated three weeks before court action and later approved by the Court on October 12, 1966, a fair agreement?

The following conclusions are made with respect to the "fairness" of the sale:

1. The FDIC prior to its appointment as receiver, attempted to assist Public and made every reasonable effort to obtain the best possible offer for the purchase of the assets and assumption of the liabilities of that bank. Upon becoming acutely concerned regarding the condition of Public in the summer of 1966, the Chairman of the Board of the FDIC, with Mr. Roddy, visited every major bank located in the Detroit area, save one, in an effort to ascertain a prospective purchaser of Public. Two banks reflected no interest at all; a third only expressed vague interest in concert with others; a fourth bank expressed some interest but placed unascertainable conditions of aid upon FDIC. The best possible and obtainable offer with reasonable FDIC assistance was that from Commonwealth Bank.

2. A specific contrast was entered between Commonwealth and Public which thereafter was amended to basically conform with the eventual receiver's sale agreement between Commonwealth and FDIC. No better offer was made to Public by any source nor was any offer from any source seriously considered acceptable by the Directors of Public Bank up to and including October 11, 1966. Furthermore, in almost a period of one year thereafter, there has been, to the knowledge of this Court, no better offer subsequently made to the receiver up to the present time.

3. The good faith of all parties concerned is reflected by the fact that it was understood between Commonwealth and FDIC that if a better deal arose which Public could make, Commonwealth would step aside in favor of the concern making the better offer.

4. Prior to and subsequent to its arrangement with Bank of the Commonwealth as of September 1, 1966, Public vigorously attempted to obtain a better agreement than that between it and Commonwealth. Its tentative arrangement with City National Bank fell apart within a week or so when the purchaser became aware of the true precarious position of Public. Discussions with Michigan Bank never got off the ground. The last minute offers made by the Zimmerman group as reflected in the minutes of Public were never seriously considered nor should they have been as they were financial schemes and not sincere proposals to add sufficient capital to the dying bank.

5. Public through its good offices could obtain no better recapitalization plan. The several attempts of Director Mebus in the spring and summer of 1966, never blossomed. Negotiations with Mr. Leeman never developed.

6. No higher bid was tendered as a premium for the going concern value of the branch offices and the deposits of Public. The receiver made strenuous efforts to ascertain likely prospects. Speculative inferences as to what is a hypothetical true value of a branch bank outlet must be differentiated from an actual cash-over-the-barrel-head offer made during exigent circumstances. There were simply no higher bids obtainable.

7. At 12:30 a. m. on October 12th, the Court had the alternative to order a strict liquidation of Public in lieu of approving the proposed receiver's sale agreement with Commonwealth. Such

alternative was clearly less desirable than a sale to Commonwealth. The premiums that Commonwealth paid for the right to conduct business at the banking house locations and for the deposits would not have been available. Loans would have realized less in the hands of an existing commercial bank. Approximately $10,000,000.00 of uninsured deposits might never have been paid. The FDIC guaranty fund made available to facilitate the sale to Commonwealth was for the purpose of avoiding a bank failure which would be contrary to the public interest, as well as the effect such failure would have on other banks.

8. The willingness of the FDIC to guarantee $10,000,000.00 against loss to Commonwealth due to its grave concern over the effect of a bank failure, reflects its conviction of the propriety of the sale.

9. The receiver's sale agreement with one different provision was approved by an overwhelming number of the Board of Directors of Public, as the amended bank-to-bank agreement of September 1 and amended September 29, was the same as the receiver's sale agreement. The only provision which was different related to the 15 day period after takeover in which the premium on deposits would be calculated. This provision was vigorously negotiated by both parties and is considered appropriate and fair by this Court in view of the fact that Commonwealth had to assume upon the transfer, the pallor of a dead bank.

10. This same sale contract between the receiver and Commonwealth was to have been recommended by the Board of Directors of Public in their proposed proxy statement to be approved by the shareholders as the best possible alternative under the circumstances.

11. The receiver's sale agreement was vigorously bargained for by both the receiver and Commonwealth and is fair and reasonable on its face. During such negotiations the following significant changes from the original bank-to-bank agreement entered into between Public and Commonwealth were made. These changes were approved by the Board of Directors of Public by the amendment to the original bank-to-bank agreement accordingly amended. Such changes were as follows:

(1) FHA and other government insured mortgages are valued at net sale proceeds if sold prior to settlement date, otherwise at market on settlement date. The original agreement provided for market value at closing date, a time when the value of these mortgages was low.

(2) The unearned income deficiency is to be calculated on the "78ths method" with a maximum adjustment of $1,575,000. The original agreement left the unearned income deficiency to be "computed by Accountants" without limit as to amount.

(3) The purchase price adjustment for "realized losses" on assets during the settlement period may not include interest accrued after October 12 and in no event may exceed the October 12 book value of the asset in any given case. Originally "realized losses" were subject to no such limitations.

(4) Collection, accounting, enforcement, legal and other expenses incurred by Commonwealth in servicing loans acquired by it are not expense items which reduce the purchase price. In the original agreement the price was to be reduced by these items.

(5) Commonwealth's assumption of Public's liabilities under the original agreement was limited to liabilities on deposits, instruments of issue, bank borrowings, accrued expenses, trade payables, real estate mortgages and liquidation expenses. Under the revised agreement the liability categories are expanded to cover contractual and other liabilities and in addition Commonwealth assumes all other liabilities not within the categories to the extent of $200,000.

(6) All unresolved disputes between seller and buyer where matters are left

to mutual agreement shall be submitted for court adjudication. In the original agreement no method for compelling agreement existed.

(7) A first right of refusal is granted to the Receiver with respect to any·asset acquired by Commonwealth that it wants to sell. Originally no such right existed.

It is most significant that the economic terms of the receiver's sale agreement were better for Public than the bargaining Public was able to strike for itself September 1, 1966.

12. Little, if any, was introduced during the course of the hearing which reflected that the terms of the agreement and the valuations placed on assets and the formulas for ascertaining losses were unfair or unjust.

In view of the extremely poor financial condition that Public Bank was situated on October 11, 1966, the likelihood of any recovery for shareholders is very remote. As there was no testimony that reflected the agreement between FDIC as receiver and Commonwealth contained any provisions other than those intended by the parties, the Court cannot alter or force a change in contract provisions upon the parties.

In Amick v. Hickey, 254 Mich. 37, 235 N.W. 859, the Court indicated that:

"Equity may not create contracts for litigants any more than may courts of law. * * *"

Where certain factors were omitted by fraud or mistake from a contract, the contract was properly reformed by the Court to include the said necessary factors.

Michigan Law and Practice Encyclopedia, Volume 5, Chancery, Section 57, Page 112, states:

"Chancery cannot make a contract for the parties. Even where a court of chancery may annul a contract for fraud or mistake, it cannot substitute therefore a different agreement fixing the liability of the parties on the

basis not contemplated or assented to by them."

In Pittsburg & Lake Angeline Iron Co. v. Lake Superior Iron Co., 118 Mich. 109, 76 N.W. 395, the Court stated:

"Courts may annul contracts for fraud or mistake but they cannot make and substitute others."

The case cited by respondents purporting to give this Court authority to alter or change the terms of a contract absent fraud or mistake related to a case where a receiver profited by the sale of a corporation for much less than its actual value. The Court appropriately set aside the transaction as patently fraudulent. Detroit Steel Products v. Heuer, 232 Mich. 55, 204 N.W. 691. Such case has no application here as no fraud is claimed or shown.

Under the terms of the receiver's sale agreement, the final pricings of certain items are not to be made for a period of 18 months. If agreements between Commonwealth and the receiver cannot be made with respect to these items, this Court has the binding authority to fix such final figures. The receiver, as an arm of the Court, is subject to this Court's direction in the administration of such sale agreement.

Accordingly, this Court concludes that the terms and provisions of the receiver's sale agreement between FDIC and the Bank of the Commonwealth is fair. The Court can make no present concluding judgment regarding the specific calculations that are to be made by the 18 month period with respect to adjustable items. Respondents have failed to demonstrate that the terms of the sale to Commonwealth were unfair or inadequate or that a better price could be obtained or that any other alternative would yield more.

ISSUE NO. XI

The next issue raises a question whether this Court may and should independently ratify the findings and orders of Judge Burdick.

It is the opinion of this Court that it may independently approve and ratify the actions of Judge Burdick. Carpenter v. Pacific Mutual Life Insurance Co. (Cal.1937) 10 Cal.2d 307, 74 P.2d 761, aff'd 305 U.S. 297, 59 S.Ct. 170, 83 L.Ed. 182. The Carpenter case involved a judge who had entered orders and was later disqualified. Subsequently another judge who was not disqualified took jurisdiction of the case and ratified, confirmed and approved the orders of the original judge. An appeal was taken claiming that all orders by the first judge were void. The California Supreme Court while agreeing with this position, nevertheless said:

"This holding, however, contrary to the contention of appellants, in no way affects the validity of any of the subsequent proceedings. The validity of the subsequent proceedings is not dependent on the validity of any order made by Judge Edmonds (i. e., the disqualified judge). The subsequent proceedings before Judge Willis stand by themselves independently of the prior orders * * * [Since] the fact that the order was void was discovered, on August 11th, he (Commissioner) secured a new order appointing him conservator, and approving everything he had done in connection with the formation of the new company, we must assume that the court below thoroughly investigated this phase of the situation and found the acts reasonably necessary. We find no irregularity or illegality in this phase of the transaction."

The United States Supreme Court affirmed the position of the California Supreme Court and concluded that the petitioners were not denied due process stating:

"The (California) Supreme Court held, however, that the court in which the Commissioner's original petition was filed thereby acquired jurisdiction and that the avoidance of the orders made by the disqualification of the judge who entered them did not dis-enable a qualified judge thereafter from entering valid orders on the petition."

This Court, based upon the record now made, ratifies and confirms the findings and orders entered October 11th and 12th, 1966. In addition, this Court, on the basis of the record of the April 6 hearing, has determined that on October 11, 1966, Public Bank was "insolvent" and that the appointment of a receiver under the attending circumstances was then "expedient". In addition, this Court has concluded that the appointment of the FDIC was valid and appropriate. Furthermore, based on the full record, the propriety of the receiver's sale agreement of the assets of Public to Commonwealth is considered fair and is approved.

## ISSUE NO. XII

This issue raises a question whether Judge Burdick was disqualified from hearing and acting upon the petition of the Banking Commissioner on October 11–12, 1966.

Originally this issue was presented to Judge Nathan Kaufman of this Judicial Circuit for determination. Judge Kaufman in view of Judge Burdick's request to the Presiding Judge to have the case reassigned, first determined that there was no issue before him. Later he denied a motion requesting that he make a definitive determination whether Judge Burdick was or was not disqualified. All parties that appeared during the April 6 hearing, requested that this Court make a determination with respect to this issue for purpose of Appellate review, if desired.

At the outset, in view of this Court's independent ratification, confirmation and approval of the conclusions and orders entered by Judge Burdick on October 12th, based upon a full record, this issue is moot. Carpenter v. Pacific Mutual Life Insurance Co. (Cal.1937) 10 Cal.2d 307; 74 P.2d 761, aff'd 305 U.S. 297, 59 S.Ct. 170, 83 L.Ed. 182.

Nevertheless, to have a determination if it is later determined that such is not

moot; it is the considered opinion of this Court that Judge Burdick was not disqualified for the purposes alleged. The claim of disqualification is based on two grounds. First, that Judge Burdick appointed as co-counsel for the receiver, a firm of attorneys one of the partners in which was his son-in-law; secondly, that at the time action was taken by Judge Burdick on October 12th, he was indebted on three loans, all secured and in good standing, to Commonwealth Bank.

Michigan General Court Rule 405.1(4) states as follows:

" * * * The judge shall be deemed disqualified to hear the action when the judge:

"(4) is related within the fifth degree (civil law) of consanguinity or affinity to any of the attorneys or counselors for any party."

The receiver is not a party to the instant action. Johnson v. Chaffee, 274 Mich. 183, 264 N.W. 336; 45 Am.Jur. 106, Receivers, 126; Fletcher Cyclopedia Corporation, Sec. 7810, p. 397–8. In view of the fact that a receivership is an arm of the Court, the foregoing GCR 405.1(4) is inapplicable.

Furthermore, the son-in-law of Judge Burdick was not "an attorney or counselor" for the receiver. Although he is one of the partners of the firm of attorneys, he himself has not participated in any of the proceedings herein. This court rule specifically does not include "all members of the law firm" as set forth in amended Rule 405.3(3) relating to Appellate Courts. The Standing Committee on Professional Ethics of the American Bar Association has interpreted the Canons of Judicial Ethics as follows:

"It would appear from the Judicial Canons quoted above (#4, #13, #26) and from the former opinion of this Committee (Formal Opinion 200) that a judge is not required to recuse himself merely because the firm employing his son was of counsel in a given case * * * "

With respect to the pre-existing indebtedness on three secured loans, it is contended that Judge Burdick accordingly is "interested as a party" within GCR 405.1(1). It is well settled that before a Judge can be disqualified from an action, his interest in a subject matter must be immediate and direct. Board of Education v. Getz, 321 Mich. 676, 33 N.W.2d 113 (1948). The slightest of interest is sufficient, provided it is immediate and not remote and contingent. Hubbard v. Hamilton County, 113 Tex. 547, 261 S.W. 990. There has been no showing that Judge Burdick would sustain any direct pecuniary gain or loss as a result of the appointment of a receiver or by the receivership sale. The three secured loans, all in good standing, do not reflect a direct interest. If it could be conjectured that a slight interest is feasible, it is clear that any hypothetical slight interest would not be immediate and would be certainly at the very most contingent.

In conclusion, Judge Burdick was not mandatorily disqualified because his son-in-law was a member of the firm selected as co-counsel for the receiver. The receiver is not a party nor is his son-in-law "any of the attorneys or counselors" for the receiver. The loans from Commonwealth fail to denote sufficient interest to require disqualification.

In any event, there is no showing that the orders of Judge Burdick were inconsistent with substantial justice.

### ISSUE NO. XIII

This issue raised the question whether this Court should have first scheduled and presided over a pre-trial conference and prepared a pre-trial statement before conducting the show cause hearing.

The show cause hearing that commenced April 6, 1967, originally was spawned from the defeasance provision placed in the order of sale by Judge Burdick on October 12th. Originally this order established that the subject show cause hearing would commence November 2, 1966. After preliminary sessions, for

the purpose of establishing ground rules, the eventual commencement date was set for November 28, 1966. However, at that time this cause was removed to the Federal Court and thereafter interlocutory appeals were pursued.

Had this hearing commenced on its original assigned date or shortly thereafter, a pre-trial hearing would have been impossible under the circumstances. Such pre-trial hearing was never contemplated nor is a pre-trial hearing required under the rule relating to a matter such as this.

The general rule concerning pre-trial provides that in every "contested civil action" a pre-trial conference is to be held and that a statement be filed and served "at least 10 days in advance of trial". The proceedings before this Court have not been a contested civil action in the usual sense of such term. The action before this Court was precipitated on an order to show cause. Such proceeding is traditionally processed as a motion requiring a motion praecipe. In fact, all responsive pleadings filed were in forms of motions with attached motion praecipes. This Court determined that all of such positions of the aggrieved parties should be heard in one hearing to avoid multiplicity and duplication. Under such circumstance there was no mandatory legal requirement for a pre-trial conference procedure or statement.

Here a show cause hearing was set for a date certain and a statutory proceeding initiated by the State Banking Commissioner. Respondents embarked upon the hearing and raised no objection as to the absence of a pre-trial conference and statement until the hearing was well along. In view of the many participants and varied positions taken by respective interested parties, this Court did hold ground rule sessions prior to the commencement of the show cause hearing. Every opportunity was extended to respondents to secure discovery. The Court, during the course of the hearing, offered to adjourn the proceedings from time to time in order to permit any

counsel additional time to examine exhibits, to obtain discovery or to consult with expert witnesses. No such adjournment request was made of the Court. No respondent has made any showing of prejudice by reason of the absence of pre-trial conference or procedure. Accordingly, the absence of the pre-trial procedures did not constitute error under the circumstances vitiating the hearing conducted by the Court.

It is submitted that this case falls within the reasoning set forth in the recent decision of the Court of Appeals in Houfek v. Shafer, (June 27, 1967) 7 Mich.App. 161, 151 N.W.2d 385. The Court stated as follows:

"The summary which the court rule demands was not made and served as required. However, to hold that under the circumstances of this case this omission requires reversal for a new trial is unwarranted. Whereas we have held in the past that it is reversible error to fail to hold pretrial conferences and conform with the court rule in relation thereto, under the circumstances of this case we do not do so because of the special nature of this action. A reading of GCR 1963, 730.3, clearly indicates that a pretrial was intended in paternity proceedings as it is the latest time to exercise the right to request a blood test under the act. Had the court not adjourned the cause sufficiently long to allow the defendant to augment his defense, we might have been constrained to reverse. Had the defendant indicated any prejudice by the court's failure to provide the pretrial statement within 10 days of trial, likewise we might have been constrained to reverse. Where the trial judge, as here, with painstaking care seeks to protect the rights of the defendant, we will not reverse on a technicality in the rules of procedure where no prejudice is shown."

## ISSUE NO. XIV

This issue raises the question whether the assignment of this cause from Judge

Burdick to Judge Moody was permissible and appropriate under the Michigan Court Rules. This question has been determined by Judge Murphy who under the Court Rules is charged with such determination. It would be inappropriate for this Court to further pass upon the determination of Judge Murphy. His determination will stand on its merits.

## SUMMARY

In conclusion, the orders appointing the receiver and counsel and approving the receiver's sale agreement, are approved and adopted. Public Bank on October 11, 1966 was insolvent. It was on the brink of collapse. The effects of a run upon and resultant ruin of a major Detroit bank would have shaken the foundation of fiscal stability in this community and perhaps beyond. It was expedient to appoint a receiver. The sale of Public's assets to Commonwealth was fair and the best possible arrangement available. In almost every particular the very same sale terms were approved by the Board of Public Bank in its direct agreement with Commonwealth. The time to consummate such direct agreement between the banks, however, had expired. No other source offered an acceptable alternative. Under such emergency circumstances, prior notice and a lengthy hearing were not necessary nor possible. The subsequent hearing has provided due process.

The State Banking Commission and the Federal Deposit Insurance Corporation's public officials discharged their responsibilities in the public interest. Depositors and creditors were fully protected. Stockholders obtained the best sale arrangement available. Confidence in our banking community was maintained.

Appropriate orders reflecting the above may be presented.

BLAIR MOODY, JR.

BLAIR MOODY, JR., Circuit Judge

Dated:

Detroit, Michigan
September 29, 1967